ICONCO, a corporation, Plaintiff, Appellee, and Cross-Appellant,

v.

JENSEN CONSTRUCTION COMPANY, a corporation, Defendant, Appellant, and Cross-Appellee.

Nos. 79-1824, 79-1860.

United States Court of Appeals, Eighth Circuit.

Submitted April 17, 1980.

Decided June 12, 1980.

W. Don Brittin, Jr., Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, Iowa (argued), and Randall G. Horstmann, Des Moines, Iowa, on brief, for Jensen.

Wade H. Hover, Los Gatos, Cal. (argued), Richard G. Langdon and William R. Clark, Jr., Herrick, Langdon & Langdon, Des Moines, Iowa, on brief, for Iconco.

Before HEANEY and ARNOLD, Circuit Judges, and WRIGHT,* District Judge.

ARNOLD, Circuit Judge.

This is a diversity case. Iconco, the plaintiff below, was the second lowest bidder on a small-business "set aside" construction contract let by the Corps of Engineers. Jensen Construction Company, the low bidder, was awarded the contract. Iconco filed suit in the United States District Court for the Southern District of Iowa claiming that Jensen, in making its bid, falsely certified that it was a small business under federal law and was awarded the contract based upon that certification. Iconco claimed damages and lost profits based upon fraud and unjust-enrichment theories under Iowa law. The jury awarded Iconco $61,503 on its unjust-enrichment claim, and $10,000 actual damages and $30,000 punitive damages for fraud. The District Court, the Hon. Donald E. O'Brien, entered judgment in the amount of $61,503, but set aside the award for fraud, finding insufficient evidence to support the verdict. We affirm.

I.

On October 10, 1974, the Corps of Engineers issued an invitation for bids for the removal of structures and the building of barricades in connection with the construction of the Saylorville Reservoir in central Iowa. Only "small businesses" were eligible to bid. The invitation for bids stated that the average annual receipts of the bidder and its affiliates for the preceding three fiscal years could not exceed $7,500,000. Both Jensen and Iconco submitted bids, and each certified that it was qualified under this standard. Fourteen bids in all were submitted. The bids were opened on November 12, 1974, and Jensen was declared the low bidder and Iconco the second low. On December 4, 1974, at the Corp's request, Jensen and Iconco granted the Corps an additional 30 days in which to consider their bids.

On December 6, 1974, in connection with an entirely separate project, the Corps received a protest from Orvedahl Construction questioning Jensen's status as a small business. That same day, as required by 13 C.F.R. § 121.3–5(b) (1974), the Corps sent the protest to the Small Business Administration for a determination of Jensen's status. On December 10, the SBA wrote to ask Jensen to respond. Jensen's Controller, Leslie Walker, received the letter from the

* The Hon. Scott O. Wright, United States District Judge for the Western District of Missouri, sitting by designation.

SBA on December 12. He did not understand the regulations and phoned the SBA for an explanation. He was told that the gross receipts of Jensen's subsidiaries, Jensen Construction Company of Oklahoma and States Construction Company, should be included in calculating Jensen's average gross annual receipts for purposes of small-business eligibility. The average annual gross receipts of Jensen alone did not exceed $7,500,000. If the receipts of Jensen's two subsidiaries were included in the calculation, however, the resulting figure would exceed $7,500,000, and Jensen would not be eligible to bid. Mr. Walker did not respond to the SBA letter. And at that time, and for some time thereafter, he was not aware that Jensen had submitted a bid on the Saylorville project certifying itself as a small-business concern.

Iconco, meanwhile, knew nothing about the Orvedahl protest and was not aware that Jensen was not a small business. Corps officials handling the letting of the Saylorville contract were also unaware. So, on December 16, 1974, the Corps awarded the Saylorville contract to Jensen.

On December 18, 1974, the SBA advised the Corps, in connection with the Orvedahl protest, that Jensen did not qualify as a small business; Jensen was also notified and advised of its right to appeal this determination to the SBA Size Appeals Board. The notification was received by Jensen on December 23. On December 24, Jensen filed an appeal; that same day, Jensen was advised by the Corps to begin work on the Saylorville project. Jensen did so soon thereafter.

In January, 1975, Iconco became aware for the first time that Jensen might not qualify as a small business. On January 16, Iconco wrote the Corps of Engineers protesting the award of the contract to Jensen and demanding that the Corps terminate the contract with Jensen and award it to Iconco. On January 20, 1975, Colonel W. H. Johnson, contracting officer for the Corps, wrote Iconco advising that under the regulations Jensen's certification of eligibility had to be accepted at face value absent a timely protest, that there was no protest before the contract was awarded to Jensen on December 16, 1974, that Jensen had completed six per cent of the work on the Saylorville contract, and that the Corps would not terminate the contract with Jensen. Iconco on January 23 and on February 3, 1975, wrote Jensen demanding that Jensen relinquish the contract and threatening to sue if it did not do so. Jensen refused, and completed the work under the contract, for which it was fully paid by the government.

Suit was filed by Iconco in the Court below on July 28, 1975. The initial pleading was styled "Complaint for Money Received (Fraud)." Although no basis of jurisdiction other than diversity was expressly alleged, the complaint stated that "it would be inequitable under applicable Iowa or federal law, to allow defendant JENSEN to retain the benefits of its fraud . . . ." On February 18, 1976, the District Court sustained Jensen's motion to dismiss that portion of the complaint which attempted to state a claim under federal law. The Court noted, however, that the complaint might state a claim under state law, and Iconco was ordered to plead its state-law theory with particularity. Iconco filed its first amended complaint on March 11, 1976, and made two claims under the common law of Iowa. Count I alleged that Jensen had been unjustly enriched in the amount of $68,627.48 at the expense of Iconco and that Iconco had suffered an additional $10,000 in consequential damages. Count II alleged fraud and asked for $78,627.48 in actual damages, trebled. This amended pleading survived a motion to dismiss.

After trial, the jury awarded Iconco $61,503 on its claim for unjust enrichment (the amount found to be Jensen's profits), and on its fraud claim $10,000 actual and $30,000 punitive damages. At Jensen's motion, the District Court set aside all damages for fraud but refused to set aside the damages for unjust enrichment, and judgment was entered accordingly.

Jensen makes several arguments on appeal. Its primary argument is that an un-

successful bidder on a small-business set-aside contract, as a matter of law, has no claim against the successful bidder who did not qualify as a small business. Both parties agree that the Small Business Act, 15 U.S.C. § 631 et seq., does not expressly authorize a suit like this. The Act is silent about an unsuccessful bidder's civil remedies. There is no question before us of whether a federal right of action may be implied. At the outset of this case, the District Court dismissed that portion of the complaint which arguably attempted to state an implied federal right of action; Iconco does not appeal that dismissal, and the issue is not before us. Iconco based its claims in the District Court, and argues on appeal, that it is entitled to recover for fraud and unjust enrichment under the common law of Iowa. The first question before us, then, is whether Iconco stated a claim of unjust enrichment or fraud under Iowa law.

## II.

Our inquiry begins with an analysis of Iconco's claims. Count I of the complaint sought recovery based on the theory of money had and received—in other words, unjust enrichment. "Money had and received" was developed at early common law as one of the common counts, or subordinate categories, of the form of action known as general assumpsit. Although it developed gradually in English common law, by the mid-eighteenth century it became the preferred remedy where a defendant had received money which he was "obliged by the ties of natural justice and equity to refund." *Moses v. MacFerlan*, 2 Burr. 1005, 1012, 97 Eng.Rep. 676, 681 (K.B. 1760); Ames, *The History of Assumpsit*, 2 Harv.L.Rev. 53 (1888). In this country, the remedy was recognized early by the courts. By the 1930's, the principle against unjust enrichment had become a major topic of law deserving of a Restatement. Section 1 of the Restatement of Restitution (1937) began simply: "A person who has been unjustly enriched at the expense of another is required to make restitution to the other."

The courts of Iowa adopted the general principle against unjust enrichment at an early date. *Norway v. Clear Lake*, 11 Iowa 506 (1861) (if money is received by one which belongs to another, the law implies a promise to pay it over); *McClean v. Stansberry*, 151 Iowa 312, 131 N.W. 15, 16 (1911). ("If the defendant has money in his hands which in equity and good conscience belongs to plaintiff, the law implies an agreement or obligation on his part to pay it on demand . . . ."). The requirements of proof are neither technical nor complicated. "[I]t is essential merely to prove that a defendant has received money which in equity and good conscience belongs to plaintiff." *In Re Estate of Stratman*, 231 Iowa 480, 488, 1 N.W.2d 636, 642 (1942). The unjust-enrichment principle has been consistently applied and favored by the courts of Iowa. *E. g., Key Pontiac, Inc. v. Blue Grass Savings Bank*, 265 N.W.2d 906 (Iowa 1978); *Hulme v. Stumma*, 204 N.W.2d 632 (Iowa 1973); *Schildberg Rock Prods. Co. v. Brooks*, 258 Iowa 759, 140 N.W.2d 132 (1966); *Shadle v. Borrusch*, 255 Iowa 1122, 125 N.W.2d 507 (1963).

Count II of the complaint alleged common-law fraud, also an action of ancient origin. A writ of deceit existed as early as 1201 and lay against one who had swindled another by the misuse of a legal procedure. 1 Street, *Foundations of Legal Liability* 376 (1906). The foundation case for the modern law of fraud was *Pasley v. Freeman*, 3 Term Rep. 51, 100 Eng.Rep. 450 (K.B.1789), after which it was recognized as a species of tort action. Prosser, *The Law of Torts* § 105 (4th ed. 1971). Actions for fraud were heard by the Iowa courts at an early date, *Gee v. Mass*, 68 Iowa 318, 27 N.W. 268 (1886), and the elements of fraud in Iowa have long been well established. *Grefe v. Ross*, 231 N.W.2d 863 (Iowa 1973).

In summary, the claims of Iconco were based upon principles of ancient origin and consistent application, and the authority of Iowa courts to entertain suits for fraud and unjust enrichment is unchallenged. It is also true, of course, that before the passage

of the Small Business Act, the actions of Jensen of which Iconco complains would have led to neither unjust enrichment nor fraud. After all, Jensen was the low bidder, was awarded the contract, and fully performed, and there is nothing intrinsically unjust or fraudulent about its actions. Jensen has been unjustly enriched, if at all, only because it received the profits from the performance of a government contract which, under the standards created by the Small Business Act, it should not have performed; and it committed fraud, if at all, only because it misrepresented its gross receipts, a representation that was material only because of the Act. The questions of fraud and unjust enrichment can be resolved only by reference to the Act and regulations thereunder.

We now turn to the question whether Iowa is free to look to the Small Business Act as the standard in determining whether Jensen has committed fraud or been unjustly enriched.

### III.

Unjust enrichment does not occur in the abstract. One is unjustly enriched only by reference to some standard of justice and fairness. In fashioning this remedy, the courts of Iowa may apply any criterion they wish subject to constitutional limitations. Iowa would of course be free to look to the provisions of a state statute defining legal rights and responsibilities to discern whether one's enrichment at the expense of another had been unjust. Or, just as freely, the state could look to other generally accepted, though not statutorily defined, norms of human behavior. Courts may look to generally accepted norms of commercial behavior to determine whether one business concern has received a benefit which in equity and good conscience ought to be disgorged. The same can be said for common-law fraud. Some standard must be applied in determining whether a representation is false and whether it is material. ■ Here, the question is whether Iowa is free to look to a federal statute, the Small Business Act, for standards to apply

in fashioning its common law. We start with the proposition that there is nothing inherent in the nature of the relationship of the federal government on the one hand and the states on the other which would prohibit Iowa from doing so. In general, federal law may be fully enforced in state courts. *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 507, 82 S.Ct. 519, 522, 7 L.Ed.2d 483 (1961). Each state is bound to recognize federal statutory law just as it is bound to recognize and apply its own statutes. "The two together form one system of jurisprudence, which constitutes the law of the land for the State . . . ." *Claflin v. Houseman*, 93 U.S. 130, 137, 23 L.Ed. 833 (1876). If a state can (and in some cases must) enforce federal law in its courts, it is certainly free to look to the provisions of a federal statute for guidance in applying its longstanding common-law remedies.

■ This proposition far from ends our inquiry, however, for although Iowa has great latitude in fashioning rights and remedies for its own courts, it may not do so in a manner which would frustrate the objectives of Congress in an area in which Congress has validly chosen to legislate. *Hill v. Florida*, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1944). A state may not act in a manner which would present an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). But we are also mindful that we should not find that Congress intended to deny Iowa the right to vindicate in its chosen manner its overriding state interest in redressing unjust enrichment and fraud, an interest historically and deeply rooted in its common-law tradition, "unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). In order to resolve the question of Congressional intent, we must examine the federal statutes at issue.

## IV.

In the belief that the "essence of the American economic system of private enterprise is free competition" and that the "preservation and expansion of such competition is basic . . . to the security of this Nation," Congress enacted the Small Business Act of 1953. Title II of Act July 30, 1953, ch. 282, 67 Stat. 232. An independent government agency, the Small Business Administration, was created, and it was directed to assist small businesses in gaining access to adequate capital and credit, obtaining a fair share of government procurement, and in obtaining competent managerial assistance. The 1953 Act was reaffirmed and strengthened by Congress in 1958. Pub.L. 85–536, 72 Stat. 384. The declared purpose of the Act was to:

aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government . . . be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the over-all economy of the Nation.

15 U.S.C. § 631(a). A small-business concern was broadly defined as "one which is independently owned and operated and which is not dominant in its field of operation . . . ;" the Administrator of the SBA was directed to make more specific definitions from industry to industry and was authorized to consider, among other things, number of employees and dollar volume of business. 15 U.S.C. § 632. Congress further directed the awarding of contracts to small-business concerns as necessary to assure that they receive a fair proportion; the SBA and the government agency involved were authorized to make such determinations for individual contracts or for classes of contracts. 15 U.S.C. § 644. The making of any false statement for the purpose of obtaining anything of value under the Act was made a crime punishable by fine and imprisonment. 15 U.S.C. § 645. The Administrator was directed to promulgate regulations necessary to carry out the authority vested in the SBA under the Act. 15 U.S.C. § 634(b)(6).

The Act does not expressly authorize civil suits. In fact, the Act is silent about enforcement by a private party. The implementing regulations, 13 C.F.R. § 121 et seq. (1974), allow any bidder or other interested person to challenge the small-business status of any other bidder. The challenge must be in writing, and delivered to the responsible contracting officer within five days after the bid opening; the contracting officer must then forward the protest to the SBA. The SBA, in turn, must advise the protested bidder and ask for a response to the challenge. The bidder whose status is protested must respond within three days after it receives the protest. If it does not, the SBA will rule that it is not a small business. 13 C.F.R. § 121.3–5 (1974). Any determination of size may be appealed to the Size Appeal Board, which must, if the case is concerned with a pending procurement, act within five days. The Board receives evidence and then issues a written decision, which, absent reconsideration, is the final administrative decision. 13 C.F.R. § 121.3–6(g)(5) (1974).

Nothing is said either in the Act or its regulations about a suit by an unsuccessful bidder against a successful one, and the Act's legislative history is also silent.

In our search for the will of Congress, we also examine the Armed Services Procurement Act, 10 U.S.C. § 2301 et seq., under which the bids in question were solicited. Section 2301 reads as follows:

It is the policy of Congress that a fair proportion of the purchases and contracts made under this chapter be placed with small business concerns.

Section 2305 provides the method of advertising and accepting bids. Bids are to be opened publicly, and awards are to be made "with reasonable promptness by giving written notice to the responsible bidder whose bid conforms to the invitation and

will be the most advantageous to the United States, price and other factors considered." Furthermore, "all bids may be rejected if the head of the agency determines that rejection is in the public interest." 10 U.S.C. § 2305(c). This Act, too, is silent on the question of whether an unsuccessful bidder may sue a successful bidder, and is in fact silent on the entire issue of judicial review. *But see Cincinnati Electronics Corp. v. Kleppe,* 509 F.2d 1080, 1086 (6th Cir. 1975) (unsuccessful bidder who alleges that it is a small-business concern and that the government agency has acted illegally in letting contract has standing to seek judicial review under the Administrative Procedure Act, 5 U.S.C. § 702).

Nor do the Armed Services Procurement Regulations, which implement the Armed Services Procurement Act and the Small Business Act, provide any specific guidance. 32 C.F.R. § 1.700 et seq. (1974). In most relevant respects, they are consistent with the SBA regulations on this subject. Section 1.702(a) states that the policy of the Department of Defense is to place a fair proportion of its contracts with small-business concerns, and procurement personnel "shall be informed of the benefits that accrue to the Nation and to the Department of Defense through the proper use of the capabilities of small business concerns . . . ." Pursuant to this policy, government contracting officers are authorized to set aside procurements for exclusive bidding by small-business concerns. 32 C.F.R. § 1.706–1(a) (1974). Any bidder may protest the small-business status of any other bidder, but to be timely with regard to an outstanding bid the protest must be received within five days of the bid opening. An untimely protest will not be considered in awarding the contract on the outstanding procurement. 32 C.F.R. § 1.703(b)(1)(b) (1974). The contracting officer, however, may make a protest at any time, whether before or after the award of the contract. 32 C.F.R. § 1.703(b)(2) (1974). The Armed Services Procurement Regulations contain provisions similar to the SBA regulations with regard to appeals of size determinations. 32 C.F.R. § 1.703(b)(4) (1974).

We should not strain to seek out conflicts between a State and the United States when none exists. *Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 45, 86 S.Ct. 1254, 1260, 16 L.Ed.2d 336 (1966). The relevant federal statutes neither expressly authorize nor expressly prohibit a suit by an unsuccessful bidder against a successful one. The question here is not whether a private federal right of action may be implied. Compare *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The question is only whether Congress has impliedly prohibited the State of Iowa from looking to the provisions of the Small Business Act as a standard in determining whether Jensen has been unjustly enriched or has committed fraud. From the statutory and regulatory schemes which we have briefly described, should such a prohibition be implied?

We think not. Congress had two primary goals in mind: First, it wanted to help small businesses by assuring that they received a fair proportion of government contracts so that they might compete on an equal footing with large concerns; this goal of preservation and expansion of competition was considered "basic . . . to the security of this Nation." 15 U.S.C. § 631. Allowing the instant suit is consistent with, and in fact promotes the achievement of, this goal. If a contract set aside for small businesses has been performed by a concern that is not small, the intent of Congress has not been advanced. Allowing an unsuccessful bidder to recover on unjust-enrichment and fraud theories, when the proof justifies such recoveries, is consistent with the salutary purpose of the Act.

Congress's second primary goal was to assure that government contracts were performed in a timely and competent manner. And to the extent that the awarding of contracts to small business is compatible with getting the job done properly and at a reasonable cost to the public, setting aside contracts for small businesses accomplishes this goal. But Congress did not intend to assist small business at all costs, and authorized contracting agencies to reject all bids,

even those submitted by qualified small businesses, if necessary to the public interest. 10 U.S.C. § 2305(c). Jensen argues that Congressional intent will be thwarted if the instant suit is allowed, reasoning that businesses will be discouraged from bidding by the threat of legal action; or, having accepted a contract, a business might hesitate to start work if it knows that it might be deprived of its profits at the conclusion of its performance. We disagree. These considerations are speculative, and we do not consider them sufficient to justify our implying, in the face of Congressional silence, a prohibition against suits of this kind. The mere threat of legal action, without more, is not sufficient in our view to discourage either the submission of bids or the acceptance of a contract award. It is important to remember that the kind of legal action involved here, even when it succeeds, does not interfere with the work contracted for. The work proceeds. The Government's costs are not affected. It is not even a party to this case. The only effect of a judgment for the plaintiff is to deprive defendant of a benefit which, by hypothesis, Congress never intended it to have. If we are wrong, if the indirect and potential conflict Jensen argues here is indeed a threat to the federal procurement process, Congress may say so easily enough.

We have considered the opinions from other Courts of Appeals which have held that no federal right of action by an unsuccessful bidder may be implied under the Small Business Act. See *Savini Construction Co. v. Crooks Bros. Construction Co.*, 540 F.2d 1355 (9th Cir. 1974); *Royal Services, Inc. v. Maintenance, Inc.*, 361 F.2d 86 (5th Cir. 1966). We do not find the holdings of these cases inconsistent with the result we reach here, since they do not squarely address the issue with which we are faced. Those cases dealt with whether a federal civil cause of action may be inferred from the Small Business Act, an issue which is not before us. To the extent, however, that the language used in those cases supports the conclusion that any private suit by an unsuccessful bidder against a successful one is inconsistent with Congressional intent

and would jeopardize the proper administration of the government's contract procurement system, we respectfully disagree for the reasons we have stated.

In summary, we hold that Congress has not forbidden the State of Iowa to use the Small Business Act as a standard in determining whether Jensen has committed fraud or been unjustly enriched at the expense of Iconco.

## V.

We next consider whether the District Court was correct in ruling that the Supreme Court of Iowa, under the facts *sub judice*, would choose to apply the provisions of the Small Business Act. We have found no Congressional prohibition against doing so, but this is a separate question. We have examined the Iowa cases on unjust enrichment and fraud, but have found none presenting similar facts. If this case were before the Supreme Court of Iowa, would it use the Small Business Act as a standard in determining whether Jensen has committed fraud or been unjustly enriched?

■■■ The District Court, sitting in Iowa, answered this question in the affirmative, and this prediction concerning what the Supreme Court of Iowa would do is entitled to great weight. We customarily defer to the rulings of the district courts on matters of local law. Further, we have examined the Iowa cases on fraud and unjust enrichment, and in our view they are consistent with the District Court's ruling. We find nothing in Iowa law inconsistent with the idea of looking to a federal statute for guidance in determining whether one has committed fraud or been unjustly enriched, and we are therefore unwilling to disturb the District Court's ruling on this question.

## VI.

Jensen next argues that Iconco is not entitled to recover because, as a matter of law, it cannot prove that it was entitled to be awarded the contract. Under the provisions of the Armed Services Procurement

Act, 10 U.S.C. § 2301 et seq., the award of the contract to the low bidder, or to any bidder, is not automatic:

Awards shall be made with reasonable promptness by giving written notice to the responsible bidder whose bid conforms to the invitation and will be the most advantageous to the United States, price and other factors considered. However, all bids may be rejected if the head of the agency determines that rejection is in the public interest.

10 U.S.C. § 2305. Further, the Armed Services Procurement Regulations, 32 C.F.R. § 1.904 (1974), require the contracting officer to make an affirmative determination that a prospective contractor is responsible, and § 1.903 specifies the criteria for making this determination. Jensen argues that since the contracting officer can award the contract only to a "responsible" bidder whose bid is most advantageous to the government, and may reject all bids, no bidder, even the lowest one, has the right to expect that it will be awarded the contract. Jensen argues, in essence, that a claim for lost profits under these circumstances is speculative and improper.

The more logical approach, in our view, is to put the unsuccessful bidder to its proof; if it proves by a preponderance of the evidence that it would have received the contract award absent the successful bidder's wrongdoing, we find no persuasive reasons why recovery should be denied.

Here, Colonel Walter H. Johnson, the Corps of Engineers contracting officer for the Saylorville project, testified on Iconco's behalf. He was ultimately responsible for the awarding of the contract, and if it had not been awarded to Jensen, he would have been the one to decide to whom the award would be made.

According to Colonel Johnson, the standard procedure at bid opening, which was followed on the Saylorville contract, is to rank the bidders by amount of bid and then announce the apparent low bidder. Contractors are required as a matter of course to submit a bid bond along with their bid. If the low bidder submitted the appropriate bid bond, the contracting officer would declare it the apparent low bidder and then direct an investigation known as a "pre-award survey." The purpose of the survey is to determine whether the low bidder is "responsible," in other words, whether it has the financial resources, physical capacity, and skill to perform the contract in a competent and timely fashion. The survey is conducted in accordance with the provisions of 32 C.F.R. §§ 1.903, 1.904, and 1.905 (1974)..

Colonel Johnson testified that the overriding consideration in determining contractor responsibility is whether it can provide a performance bond; other important factors regarding responsibility, in his view, are the prior record of the contractor on similar jobs and apparent ability to concentrate sufficient resources on the job to perform the contract competently and in a timely fashion, factors which would require an evaluation of office organization, financial resources, organizational capability, and adequacy of equipment. The Saylorville job, according to Colonel Johnson, was not technically difficult, mostly "mule work" by his characterization. In his view, any contractor who had responsibly performed heavy work of any kind, including the demolition of heavy structures, could have done the job.

The pre-award survey is normally conducted by a group of technicians known as the board of awards. After completion of the survey, this board makes a recommendation to the contracting officer about whether the low bidder is competent to perform the contract according to specification. Colonel Johnson testified that the contracting officer must consider the board's recommendation, but is not bound by it. The ultimate responsibility for the award of the contract rests with the contracting officer—in this case, Colonel Johnson.

■ At trial, Iconco propounded a lengthy hypothetical question to Colonel Johnson. Colonel Johnson was asked to assume that the low bidder on the Saylorville contract was not a small business, that

the second low bidder was and submitted a bid which was reasonable in amount (roughly 50% of the amount estimated by the Corps as necessary to perform the contract), that the second low bidder could obtain a performance bond and had successfully completed in its ten years experience several other similar contracts, and that it met other requirements of the pre-award survey in terms of financial ability, licensing, organization, experience, equipment, integrity, and reputation. Assuming these facts, Colonel Johnson was asked for an opinion about whether the contract would have been awarded to the second low bidder. His answer was yes. Assuming for the moment that the hypothetical was not defective, in our view Colonel Johnson's opinion was proof sufficient to allow the jury to conclude that the Saylorville contract would have been awarded to Iconco had it not been awarded to Jensen.

■■■■ The standards by which a hypothetical question is to be judged are well-settled in this Circuit. The form of the question "must be left largely to the discretion of the trial court." *United States v. Kiliyan*, 456 F.2d 555, 561 (8th Cir. 1972). The question need not include all facts shown by the evidence or pertinent to the ultimate issue, but it should be in such a form as not to mislead or confuse the jury. *Id.* A hypothetical should include only such facts as are supported by the evidence, and "[o]nly the basic facts need be assumed in the hypothesis," *Twin City Plaza, Inc. v. Central Surety & Ins. Corp.*, 409 F.2d 1195, 1200 (8th Cir. 1969), but "a question which omits any material fact essential to the formation of a rational opinion is . . . incompetent." *Harris v. Smith*, 372 F.2d 806, 812 (8th Cir. 1967). *Accord,* Fed.R. Evid. 705, which eliminates the mandatory preliminary statement of all the facts underlying an expert's opinion. Jensen argues that the hypothetical omitted some of the findings material to the determination of responsibility by the contracting officer, but we think the question fairly characterized the material considerations. Colonel Johnson's testimony in response to other questions made clear his opinion that any

experienced contractor could have performed the Saylorville job, and we evaluate the hypothetical in that context.

■■■■ Jensen also argues that the hypothetical asked Colonel Johnson to assume facts which were not in evidence. We cannot agree. Iconco's first witness at trial was Richard Joseph Diven, Iconco's president since 1973. He testified to a number of contracts involving the demolition of bridges performed by Iconco satisfactorily before the Saylorville bid was submitted. Diven stated further that the company had obtained hundreds of bid bonds without difficulty. John E. Weber, Iconco's secretary, testified after Colonel Johnson. Mr. Weber described several of the other contracts which Iconco had performed adequately, some of which were more sophisticated and difficult than the Saylorville job. According to Weber, Iconco had never been denied a performance bond, and no one had ever questioned the integrity of the company or its financial capacity. At the time of the award of the Saylorville contract, Iconco had a qualified superintendent and the equipment necessary to do the job. In Weber's view, Iconco complied with the requirements of the pre-award survey in all respects.

On this record, the jury was fully warranted in finding that the factual assumptions required by the hypothetical question had been proved by a preponderance of the evidence.

Jensen's argument that Iconco failed to prove that it would have been awarded the contract absent Jensen's wrongdoing must be rejected.

## VII.

Jensen next argues that the Iowa law of unjust enrichment contains three principles which make Iconco's case insufficient as a matter of law: First, Iconco must prove that it (not a third party such as the government) conferred a benefit upon Jensen which it would be inequitable for Jensen to retain; second, Iconco cannot recover because it failed to file with the SBA or

Corps of Engineers a timely protest of Jensen's status as a small business; and third, Iconco cannot recover in view of the fact that Jensen obtained the benefit in question under its own claim of right, for its own use, and not for the use of Iconco.

We have examined the cases Jensen cites for these propositions. *Markworth v. State Savings Bank*, 212 Iowa 954, 237 N.W. 471 (1931); *Griffith v. Arnold & Rasmussen*, 204 Iowa 1216, 216 N.W. 728 (1927); *Skemp v. Olansky*, 249 Iowa 1, 85 N.W.2d 580 (1957). We do not find that they impose the strict requirements of proof urged by Jensen. We find no requirement in the cases that the plaintiff itself must have conferred the benefit sought to be recovered from the defendant. Further, the Iowa law of unjust enrichment imposes no prerequisite to recovery akin to exhaustion of administrative remedies. Finally, we question whether the "claim of right" argument is important in this case; if the defendant has a claim to the benefit superior to that of plaintiff, surely it would not be unjust for the defendant to retain the benefit. In this case, if Jensen did not qualify as a small business, it had no claim of right to the contract, and certainly not a claim superior to that of a small business contractor.

■ We are impressed with the simplicity of the rule echoed by the Iowa unjust-enrichment cases. "[I]t is essential merely to prove that a defendant has received money which in equity and good conscience belongs to plaintiff." *In Re Estate of Stratman*, 231 Iowa 480, 488, 1 N.W.2d 636, 642 (1942). The jury was instructed that Iconco had the burden of establishing two elements to justify recovery on its claim of unjust enrichment: First, that Jensen received a benefit to which Iconco was entitled; and second, that circumstances made it unjust for Jensen to retain the benefit. This is a fair statement of Iowa law. We have reviewed the record. It contains sufficient evidence from which the jury could find that Iconco met its burden of proof on the unjust-enrichment claim. We are unable to agree that the Iowa law of unjust enrichment imposes the requirements of proof which Jensen urges.

## VIII.

■ Jensen next argues that the District Court erred in refusing to instruct the jury as follows:

If you find that the contract awarded by the Corps of Engineers in this case to Jensen Construction Company was awarded in accordance with the applicable federal regulations, you are instructed that then the contract was valid, legal and binding upon both the Corps of Engineers and Jensen Construction Company from the date it was awarded.

In our view, the instruction carried with it the risk of misleading the jury. The core issue was not whether the contract was valid and binding on Jensen and the Corps, but whether the receipt of the contract by Jensen caused Jensen to be unjustly enriched at Iconco's expense. Iconco claimed that Jensen did not meet the applicable size standard, that it wrongfully certified that it did, and that as a result it was awarded a contract to which it was not legally entitled. That the Corps of Engineers, under federal regulations, was free to award the contract to Jensen absent protest is not relevant to whether Jensen committed fraud or was unjustly enriched. Neither is the fact that the contract, once awarded, was binding as between the Corps and Jensen.

Even assuming the relevance of the instruction to the issues before the jury, the instruction would have left the incorrect impression that Jensen had no choice but to perform the entire contract. Although Jensen was responsible for its performance, the contract itself allowed Jensen to request permission of the Corps to subcontract portions of it to another contractor. An additional instruction to this effect would have been necessary to correct the erroneous impression which might have been left by the giving of the instruction requested by Jen-

sen. The better course was that followed by the District Court. The failure to give the requested instruction was not error.

## IX.

Jensen finally argues that the District Court erred in refusing to grant its motion for directed verdict on the ground that Iconco did not qualify as a small business under applicable federal regulations. Jensen argued that Amendment 8 to the SBA regulations, 13 C.F.R. § 121.3-8(a), became effective for procurement purposes on March 18, 1974, and lowered the maximum size standard for wrecking and demolition work to $1,000,000, and that under this standard, neither Iconco nor Jensen qualified as a small business in bidding for the Saylorville contract. It follows, according to Jensen, that if neither party was a small business, Jensen was not unjustly enriched at Iconco's expense.

The District Court rejected Jensen's argument. The Court ruled that consideration of the argument, which was made for the first time late in the trial, would be unfair to Iconco. The Court noted that Colonel Johnson had not been questioned by Jensen about why the bid invitation specified the $7,500,000 standard rather than $1,000,000. In addition, the Court was unable to find that the $1,000,000 standard was applicable to the Saylorville contract.

■ We are unwilling to set aside the District Court's ruling on this question. Although we agree that injecting the issue late in trial would have unfairly prejudiced Iconco, the primary basis for our ruling is our inability, on the current record, to find that the $1,000,000 standard was applicable to the Saylorville contract.

The SBA regulations were amended effective March 18, 1974, to establish new definitions of small business for special trade contractors. The standards for certain industries were lowered from $7,500,000 to $1,000,000 or $2,000,000 depending on the type of work. The lowered standards were applicable to "contracts [the requirements of which] are classified in an industry set forth in Schedule H . . . ." Schedule H, in turn, specified the standard for "Wrecking and Demolition Work" to be $1,000,000. 13 C.F.R. § 121.3-8(2), Amendment 8, Schedule H (1974). The invitation and bid form described the Saylorville project as follows:

> Removal of Structures and Construction of Barricades, Saylorville Reservoir, Polk, Dallas, Boone and Warren Counties, Iowa.

The invitation further specified that the $7,500,000 standard was applicable "under this small business set-aside . . . ."

The determination of the classification within which a contract falls is the responsibility of the contracting officer. 13 C.F.R. § 121.3-8 (1974) reads in pertinent part:

> The determination of the appropriate classification of a product or service shall be made by the contracting officer. Both classification and the applicable size standard (number of employees, average annual receipts, etc.) shall be set forth in the solicitation and such determination of the contracting officer shall be final unless appealed in the manner provided in § 121.3-6.

Here, Colonel Johnson did not classify the contract as wrecking and demolition work, and we are in no position, on the current record, to second-guess that judgment. At trial, he was not examined on this issue by either party. We note that although the Saylorville contract involved the removal of bridges, piers, and abutments—demolition work, according to Mr. Diven—it also required the construction of barricades, gates, and turn-arounds. The record contains little to indicate that the classification of the Saylorville contract was in error. Had this issue been raised early in the District Court litigation, it could have been properly developed by the parties. We are unwilling to set aside the District Court's ruling on this question. It follows that Jensen's related argument that the regulations specifying

the $1,000,000 standard should have been provided to the jury must also be rejected.

### X.

We next turn to the sole issue raised by Iconco in its cross-appeal. Iconco argues that the District Court erred in setting aside that portion of the jury verdict which was based upon Iconco's claim of fraud. Iconco sought to show at trial that the management of Jensen knew when the Saylorville bid was submitted, or at least before the contract was awarded, that it did not qualify as a small business, and that its self-certification as a small business, was made willfully and with intent to deceive. In setting aside the damages awarded for fraud, the District Court held that there was insufficient evidence of fraudulent intent.

We have reviewed the record and agree with the District Court. The evidence establishes at most that Jensen mistakenly believed that the gross receipts of its affiliate companies did not have to be counted in meeting the $7,500,000 size standard. When it was notified by the SBA, in connection with the Orvedahl protest, that this belief was in error, the record supports no inference other than its disagreement with the SBA over the meaning of the controlling regulations. The record is totally lacking in proof that Jensen acted with the intent necessary to establish fraud under Iowa law. See *Grefe v. Ross*, 231 N.W.2d 863 (Iowa 1973). Under these circumstances, the District Court was correct in setting aside the jury verdict for fraud.

The judgment of the District Court is affirmed in all respects.