**DALEY'S DUMP TRUCK SERVICE, INC., a Washington corporation, et al., Plaintiffs,**

v.

**KIEWIT PACIFIC COMPANY, a Delaware corporation, et al., Defendants.**

No. C90–1375R.

United States District Court, W.D. Washington.

Jan. 28, 1991.

Edmund J. Wood, Wood & Jones, Seattle, Wash., J. Michael Hennigan, Tracy R. Kirkham, Robert B. Ericson, Hennigan & Mercer, Los Angeles, Cal., for Daley's Dump Truck Service, Inc., and Imagineering, Inc.

J. Michael Hennigan, Tracy R. Kirkham, Robert B. Ericson, Hennigan & Mercer, Los Angeles, Cal., for Knighten Bros. Const., Inc.

Irwin H. Schwartz, The Irwin Schwartz Law Offices, Seattle, Wash., for Kiewit Pacific Co., and Kiewit Const. Co.

Robert T. McAllister, Martin, McAllister & Murphy, Denver, Colo., for Peter Kiewit Sons.

Bradley H. Bagshaw, William A. Helsell, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for Paschen Contractors, Inc.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COMPLAINT

ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on defendants' motions to dismiss. Having reviewed the motions, together with all documents filed in support and in opposition, having heard oral argument and being fully advised, the court finds and rules as follows:

## I. BACKGROUND

This suit is a class action brought by plaintiffs Daley's Dump Truck Service, Imagineering Inc., Knighten Bros. Construction and the class of approximately 700 other minority and woman-owned business enterprises ("MWBE's") that they seek to represent. Plaintiffs are certified by the state as MWBE's and are also certified by the federal government as disadvantaged business enterprises ("DBE's"). Plaintiffs have brought this suit against defendants Kiewit Pacific Co., Kiewit Construction Co. and Peter Kiewit Sons', Inc., ("Kiewit" or "the Kiewit defendants"), and Paschen Contractors, Inc. ("Paschen"), alleging RICO violations[1] stemming from defendants' alleged scheme to subvert the mandatory "set-aside" programs that require Kiewit to subcontract work to MWBE's.

Kiewit and other general contractors must comply with federal, state and local regulations that require specified levels of participation by MWBE's on public works projects. Plaintiffs allege that since the early 1980's, in direct violation of these set-aside programs, the Kiewit defendants schemed to circumvent these statutory requirements by regularly employing Global Consultants/Construction ("Global") and Seaway Construction, Inc., ("Seaway") to act as "conduits" or "fronts." Defendant Paschen is alleged to have arranged a conduit scheme with 3A Industries. This scheme purportedly allowed Kiewit and Paschen to appropriate for themselves the profit on subcontracts that defendants were legally required to award to legitimate MWBE's under the set-aside programs.

Specifically, plaintiffs describe the scheme as follows: The Kiewit defendants

1. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

enlisted the participation of Global and Seaway, both of which are certified as MBE's and WBE's, and both of which agreed to act as conduits. Kiewit and the conduits agreed that Kiewit would name them as MWBE subcontractors on bids, even though the conduits would not prepare bids to obtain the subcontracts. If Kiewit was the successful bidder on a project, Kiewit advised the conduits of the nature of their subcontracts. In many instances, Global and Seaway were awarded subcontracts to perform kinds of work for which they were not certified. The conduits' role in performing the subcontracts was limited to requesting the necessary union workers pursuant to Kiewit's directions, and to supplying a minority employee to pose as the conduits' foreperson on the job site. The union crews were actually supervised by Kiewit personnel, and were paid by Kiewit through the conduits' bank accounts. The conduits neither performed the subcontracts nor earned a profit in the traditional sense of the word. Instead, Kiewit paid the conduits a fee for "fronting" on the projects. These fees are much smaller than the profits that would have been earned by legitimate MWBE's. This alleged scheme provided defendants with an additional profit margin that they could sacrifice to underbid the competition.

Plaintiffs allege that the scheme was implemented, perpetrated and concealed through a pattern of racketeering activity. Each of the contracts on which the conduit scheme was used was obtained through acts of mail fraud; Kiewit submitted its bid to the government knowing that, if it was the successful bidder, it would be mailed a "condition of award" letter which incorporated into the contract the identity of the MWBE subcontractors that Kiewit would use to satisfy the set-aside programs. Kiewit concealed the scheme by mailing false compliance reports to the government, and obtained final payments by mailing false certifications of compliance. The fraudulent activity was directed at the governmental agencies that control public works contracting.

Kiewit allegedly concealed its scheme by bribing public officials, and by engaging in a pattern of extortion. The complaint specifically accuses certain officials within the Washington Office of Minority and Women's Business Enterprises and Seattle's Office of Human Rights of accepting bribes.

The complaint further alleges that the owner of plaintiff Knighten Brothers was threatened by managers of Global, Seaway and 3A Industries after he wrote a letter to the Seattle Office of Human Rights, complaining about the award of a contract to Kiewit and Global. The director of the Northwest Minority Contractors and Business Association, Charles Adams, was also allegedly threatened and intimidated.

The complaint sets forth a list of thirteen different contract jobs, including the West Seattle low bridge, various stages of the I-90 floating bridge, the 405 "S" Curves, and the Tacoma Wastewater Treatment Plant, where Kiewit used Global and Paschen used 3A Industries as the named MWBE's for the contracts. None of the plaintiffs have been awarded a significant subcontract from the Kiewit defendants or Paschen since at least 1982.

The class of plaintiffs represents all other legitimate MWBE's that potentially could be tapped for use in the projects on which Kiewit was awarded contracts. The complaint concludes that Kiewit and Paschen obtained profits through the alleged scheme that should have gone to the legitimate MWBE's. This caused injury to the MWBE's businesses since it reduced the opportunity for plaintiffs to participate in public works contracts awarded to plaintiffs.

Plaintiffs seek relief in the form of treble damages of $5 million from the Kiewit defendants and $1.5 million from Paschen for lost profits and business opportunities from violation of RICO § 1962(c), injunctive relief prohibiting defendants from continuing with any conduit scheme, and attorneys' fees and costs.

The Kiewit defendants now bring a Rule 12(b)(6) motion to dismiss for failure to state a claim. Paschen has joined this motion and filed its own motion to dismiss for lack of subject matter jurisdiction as to the absence of a case or controversy. Defen-

dants argue that plaintiffs lack standing to sue under RICO; plaintiffs fail to adequately allege a violation of § 1962(c); plaintiffs fail to properly allege predicate acts, especially fraud, because they show no injury, reliance, or causation even under mail fraud law; plaintiffs fail to plead the elements of a RICO conspiracy; and that the claims are limited by the statute of limitations.

The court requested oral argument, and directed that the arguments be focused on the question of plaintiffs' standing to bring this class action suit.

## II. DISCUSSION

■ Defendants move for dismissal of plaintiffs' complaint pursuant to Fed.R. Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted.[2] A motion to dismiss tests the sufficiency of the allegations in the complaint. *Rae v. Union Bank,* 725 F.2d 478, 480–81 (9th Cir.1984). The court will first address the arguments that plaintiffs lack standing to bring suit.

### A. *Constitutional Lack of Standing*

Article III of the U.S. Constitution requires that a plaintiff make out a "case or controversy" between itself and a defendant if it is to be heard in federal court. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).[3] Injury and causation are essential elements of any case or controversy:

> The constitutional limitations of article III contain three components: 1) a threatened or actual distinct and palpable injury to plaintiff; 2) a fairly traceable causal connection between the alleged injury and the defendants' challenged conduct; and 3) a substantial likelihood that the requested relief will redress or prevent the injury.

*Hong Kong Supermarket v. Kizer,* 830 F.2d 1078, 1081 (9th Cir.1987). For a plain-

tiff to show injury and causation it must allege a personal stake in the outcome of the action:

> As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf.

*Warth, supra* 422 U.S. at 498–99, 95 S.Ct. at 2204–05 (emphasis in original).

■ The only plaintiffs whose claims may be considered in deciding whether plaintiffs have standing to bring this lawsuit are the named plaintiffs. "If the plaintiff has no standing individually, then no case or controversy arises, and the plaintiffs' claims are not typical of the claims of those who might otherwise litigate the action." 1 H. Newberg, Newberg on Class Actions, (2d ed. 1985) § 2.07 at 56. The Supreme Court also elaborates on this principle in *Warth:*

> Petitioners must allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves *personally* and respondents, "none may seek relief on behalf of himself or any other member of the class."

422 U.S. at 502, 95 S.Ct. at 2207, quoting in part *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) (emphasis added). The *Warth* court held "that when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." 422 U.S. at 499, 95 S.Ct. at 2205.

**2.** Since Paschen had already filed an Answer in this matter it technically cannot seek dismissal through Kiewit's 12(b)(6) motion. The court will treat the motion as though it was raised under Rule 12(c), which seeks judgment on the pleadings.

**3.** This suit was brought to challenge the town of Penfield, NY and its Zoning, Planning and Town Boards, claiming that the town's zoning ordinance effectively excluded persons of low and moderate income from living in the town, in violation of the Civil Rights statutes. The Supreme Court upheld the District Court's decision to dismiss the complaint for lack of standing.

■ In order for the three named plaintiffs to "allege a personal stake" in this controversy, they must allege that they would have bid for and received some or all of the work given by defendants to the alleged fronts. At oral argument, plaintiffs conceded that the current named plaintiffs are unable to make an individualized argument for injury as to the enumerated projects in the complaint. However, they argue that the named plaintiffs and class members *were* injured through loss of business opportunities over the past eight years. Given the "hundreds" of projects on which defendants have been awarded contracts over the years, plaintiffs argue that the named class members statistically would have been awarded a subcontract at some point during this time period, absent the "conduit" scheme in place.

Following the analysis of *Warth* and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and viewing the complaint as it now stands, the court cannot find that the named plaintiffs have adequately established anything more than a "generalized grievance" about lack of potential business opportunities during past years. There are no allegations in the complaint that the named plaintiffs were qualified for, or bid on, any of the thirteen named projects at issue. It is insufficient for purposes of threshold standing analysis to speculate that one of the named plaintiffs would have likely received at least *one* contract out of hundreds from defendants during the past decade, given the laws of probability.

Defendants conceded at oral argument that the constitutional standing problem could conceivably be overcome if additional specific facts were plead in the complaint. Given the court's ruling on other issues, it is not called upon to address that potential question.

### B. Statutory Lack of Standing

■ 18 U.S.C. § 1964(c) of RICO requires that plaintiff show injury "in his

**4.** This case is quite similar to that of *Zimmerman, supra,* where the representative plaintiffs sought to assert a RICO claim on behalf of a

person or property by reason of" a RICO violation to prevail. The "by reason of" language creates standing and also requires that plaintiffs must show proximate cause and injury. *O'Malley v. O'Neill,* 887 F.2d 1557, 1561 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); *Wilcox v. First Interstate Bank,* 815 F.2d 522 (9th Cir.1987).

As in the constitutional standing analysis described above, plaintiffs cannot achieve standing under RICO by simply describing a class whose other members may have standing. *Allee v. Medrano,* 416 U.S. 802, 828–9, 94 S.Ct. 2191, 2106–7, 40 L.Ed.2d 566 (1974) ("It bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.") (Burger, C.J., in concurrence); *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163 (3rd Cir.1987) ("It is well settled that to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim.")

Standing must be established before a court will look to Fed.R.Civ.P. 23 to evaluate the ability of named plaintiffs to represent the proposed class. Rule 23 cannot alter or abridge the limitations on cases, controversies, or statutory claims, that are mandated by the Constitution or by Congress.

> As a procedural rule, Rule 23 cannot be construed to extend or limit the jurisdiction and venue of federal courts or to abridge, modify or enlarge any substantive right. Thus, for example, a class action cannot confer standing to sue on a named plaintiff who seeks to represent a class ... (A) class representative must have individual standing to raise the claims in controversy, and then that plaintiff can represent a class under procedural Rule 23.

1 H. Newberg, Newberg on Class Actions § 1.02 at 4–5.; § 2.08 at 61.[4]

class that had allegedly lost money due to defendant's actions. The Third Circuit held:

■ The RICO predicate acts that plaintiffs allege as causing injury are three types of mail fraud upon third parties, which in this case are the contracting governmental authorities. Each act of mail fraud that plaintiffs allege in their complaint concerns a mailing to or from the government.[5]

■ To adequately plead a mail fraud predicate act, plaintiff must allege harm to a property right, direct reliance upon a fraudulent misrepresentation by defendants, and causation. *O'Malley v. O'Neill, supra.* Defendants argue that since plaintiffs were only indirectly harmed by the alleged fraud against the governmental agencies, they have not suffered direct injury under RICO and therefore lack standing to sue. As described above, defendants point out that instead of direct harm, plaintiffs only allege that the scheme "reduced the opportunity for plaintiffs to participate in public works contracts awarded to defendants."

Washington law is clear that there is no property right in the mere desire to obtain business, without a valid contract or concrete expectation of gain. *See Broten v. May,* 49 Wash.App. 564, 568–9, 744 P.2d 1085 (1988); *Pleas v. Seattle,* 112 Wash.2d 794, 800–2, 774 P.2d 1158 (1989); *Del Guzzi Construction v. Global Northwest,* 105 Wash.2d 878, 719 P.2d 120 (1986) (no intention by government to directly benefit a minority business enterprise plaintiff through creation of minority participation program).

Plaintiffs are also unable to establish reliance and harm when the allegations involve fraud directed against the government.[6] In *District Telecommunications Dev. Corp. v. District Cablevision,* 638 F.Supp. 418 (D.D.C.1985), the D.C. Circuit held that a private plaintiff lacked standing where the claim was for fraud upon the government. A cable television corporation sued its competitors under RICO alleging fraud in procuring the exclusive franchise to provide a cable television system to the District of Columbia. The court stated, "(p)laintiff is seeking compensation for a lost opportunity created by an alleged fraud perpetrated not on plaintiff but on the District of Columbia." *Id.* at 419. The court granted defendants' motion to dismiss and explained:

> Perhaps the most unusual aspect of this case is that plaintiff was not the prime target of any alleged fraud, but rather a third-party recipient of its effects ... Since there cannot be shown as a matter of law that but for defendants (sic) alleged fraud, plaintiff would have received a franchise ... this court must dismiss plaintiff's claim as one which fails to state an injury cognizable under RICO.

*Id.* at 422. Plaintiffs argue that this case is distinguishable since the District of Columbia had discretion about allocating the contracts, while in this case there is no discretion. On the contrary, the court finds strong parallels to the case at bar since there was no guarantee that any particular plaintiff would be awarded a subcontract. The Kiewit defendants had full discretion over with whom it chose to subcontract. In fact, defendants were under

---

The plaintiff insisted at oral argument that, had the class been certified, class members who had paid money might have been located and persuaded to come forward as representatives. The plaintiff argues that the district court erred in dismissing the motion for certification as mooted by dismissal of the complaint instead of considering the merits of class certification....

(W)e find no abuse of discretion in the district court's refusal to consider certification of a class before determining whether the named plaintiff, and *a fortiori* any putative class which the named plaintiff might properly seek to represent, had a federal cause of action.

834 F.2d at 1169–70.

**5.** Plaintiffs also allege predicate acts of bribery and extortion. However, the court finds that named plaintiffs are unable to assert any standing based on injury for these acts since none of them were targets of the alleged bribes and extortion. The court will address itself only to standing related to the mail fraud allegations.

**6.** *See United States v. Lew,* 875 F.2d 219, 221 (9th Cir.1989) ("While it is true that after *McNally* [*v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292] [ (1987) ] the elements of mail fraud remain unchanged except that the intent of the scheme must be to obtain money or property, the Court made it clear that the intent must be to obtain money or property from the one who is deceived ...")

no statutory obligation to award the subcontract to the lowest bidder.[7]

Although reliance is not an element of criminal mail fraud, when mail fraud is pled as a RICO predicate, reliance and causation *are* elements that must be pled. *O'Malley v. O'Neill,* 887 F.2d at 1563; *Wilcox v. First Interstate Bank N.A.,* 815 F.2d 522, 532 (9th Cir.1987).

In *Carter v. Berger,* 777 F.2d 1173 (7th Cir.1985), the court held that taxpayer/plaintiffs had no standing to bring RICO claims against private defendants who bribed county tax board members to obtain favorable tax assessments. The court held that the taxpayers were only indirectly injured by the consequent tax increases; the fraud was directed at the county. The county was the proper party with standing to bring the suit.[8]

Plaintiffs have conceded that in this alleged scheme, direct injury to named plaintiffs is difficult to establish with precision. Plaintiffs urge the court to look to antitrust law as a basis for characterizing the harm alleged here. Plaintiffs argue that their ability to allege "injury to business or property" need only be shown through proof that plaintiffs have taken "substantial steps" to enter the relevant market, and that those efforts "have been thwarted." *See Central Telecommunications v. T.C.I. Cablevision,* 800 F.2d 711, 729 (9th Cir.1986).

In *T.C.I. Cablevision,* plaintiff was able to allege antitrust violations under § 4 of the Clayton Act by showing that it had made sufficient preparations to enter the cable television business, but was prevented from doing so through the alleged antitrust actions and tortious interference of defendant.

■ Plaintiffs argue that their "substantial steps" to enter the market consist of applying and qualifying for certification as MWBE's. Even if the court were to adopt the antitrust analogy for purposes of this standing argument, the court finds mere completion of the certification process to be insufficient for plaintiffs to meet the "substantial steps" threshold. Again, the deficiency turns on the named plaintiffs' inability to establish that they were appropriate businesses to bid on the projects at issue, or to establish they took steps to compete for selection as subcontractors on those jobs.

## CONCLUSION

The court recognizes the dilemma faced by plaintiffs who feel that the alleged scheme has frustrated any ability to meaningfully participate in a State program specifically designed to aid the development of their businesses. If the allegations are true, this case may well represent what plaintiffs' counsel described at oral argument as "a wrong screaming for a remedy." Unfortunately, as the case is currently framed, the court finds that these plaintiffs lack statutory standing to bring this as a RICO action.[9]

Plaintiffs have asserted to the court that, should the court find a lack of RICO standing, they intend to amend their complaint to pursue alternative remedies.

7. Plaintiffs' citations to *Iconco v. Jensen Construction Co.,* 622 F.2d 1291, 1300 (8th Cir.1980) and *Service Engineering v. Southwest Marine, Inc.,* 719 F.Supp. 1500 (N.D.Cal.1989) are unsupportive of their position. In both those cases the plaintiff was the second lowest bidder on a job that another business won under a small business set-aside, and the plaintiff claimed that the winner did not meet government requirements for a small business. In *Iconco,* the plaintiff not only proved that it was the second lowest bidder, but also that it alone would have received the contract because of its qualifications. In *Service Engineering,* plaintiff also proposed to meet this standard of proof. Neither case involved RICO claims or involved a potential class of members.

8. The *Carter* court compared the plaintiffs' RICO argument to the "passing on" argument in antitrust law. This antitrust concept precludes indirectly injured customers from suing for recovery of overcharging. The indirect purchaser recovers nothing, even if it bore the whole overcharge and even if the direct purchaser did not sue. 777 F.2d at 1175; *see also, Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Kansas v. Utilicorp United,* — U.S. ——, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).

9. Given the court's ruling on standing, it need not address the other grounds defendants set forth for dismissal of the complaint.

THEREFORE, the court GRANTS defendants' motions to dismiss the complaint, and dismisses the complaint without prejudice and with leave to refile with alternative claims. All other pending motions in this case are STRICKEN.