**LAKESIDE FEEDERS, INC., Plaintiff,**

v.

**PRODUCERS LIVESTOCK MARKETING ASSOCIATION and Producers Livestock Credit Corporation, Defendants.**

No. 1:09–cv–00046–JEG.

United States District Court,
S.D. Iowa,
Western Division.

Jan. 10, 2011.

Brian C. Buescher, Bartholomew L. McLeay, Amy Lynn Van Horne, Kutak Rock LLP, Omaha, NE, for Plaintiff.

Jason B. Bottlinger, David A. Domina, Terry A. White, Domina Law Group, Omaha, NE, Joseph J. Heidenreich, Dresselhuis and Heidenreich, Odebolt, IA, for Defendants.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on motion for summary judgment brought by Defendants Producers Livestock Marketing Association (PLMA) and Producers Livestock Credit Corporation (PLCC) (collectively, Defendants or Producers). Plaintiff Lakeside Feeders, Inc. (Lakeside) resists the motion. The Court held a hearing on the motion on December 10, 2010. Defendants were represented by attorney Jason B. Bottlinger. Plaintiff was represented by attorneys Bart L. McLeay and Brian C. Buescher. The matter is fully submitted and ready for disposition.

## I. BACKGROUND [1]

PLMA is a cooperative corporation that buys and sells livestock and provides marketing and hedging services to partici-

---

[1] The facts of this case are either not in dispute or are viewed in the light most favorable to Lakeside, the non-moving party. *See Smith v. Hy-Vee, Inc.*, 622 F.3d 904, 907 (8th Cir. 2010) (per curiam).

At the hearing, Lakeside argued that its statement of additional facts should be deemed admitted because Producers failed to reply thereto in violation of Local Rule 56.d. Local Rule 56.d provides that

The moving party must, within 7 days after service of the resisting party's statement of additional facts, file a reply in which the moving party expressly admits, denies, or qualifies each of the resisting party's numbered statements of additional fact. A reply to an individual statement of additional material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the moving party's refusal to admit the statement, with citations to the appendix containing that part of the record. LR 56.d. Producers' only response to Lakeside's statement of additional facts consisted

pants in the agricultural industry. PLCC is a wholly owned subsidiary of PLMA that provides lending services to customers through both a Direct Loan Program and a Hog Investment Program (Hog Program). Under the Direct Loan Program, PLCC executes a promissory note, a loan agreement, and security agreement with the borrower. *See* Pl.'s App. 228–29. Under the Hog Program, no promissory note or security agreement is executed, and the Hog Program Agreement is the only document that illustrates the obligations of PLCC and the borrower.

In November 2007, Tracy Gayer, DVM (Dr. Gayer), a veterinarian that sought to become engaged in the business of raising hogs for sale at market, contacted Producers and learned that PLCC provided financing for the purchase and growing of hogs. On or about December 27, 2007, Dr. Gayer's corporation, Prairie Pork, Inc. (Prairie Pork),[2] and Producers executed a Hog Program Agreement (the Hog Agreement). The terms of the Hog Agreement provided that "PLCC [would] finance the purchase price of pigs plus 70% of market price of those hogs that are price-protected through our Commodity Office or Packer Contracts less the bases." Pl.'s App. 240, ECF No. 47–4. The Hog Agreement incorporates by reference a Hog Feeder Program Proposal (the Proposal), "which is a further explanation of what's in the hog agreement," Pl.'s App. 219, ECF No. 47–4, and explains that "[PLMA] shall receive the normal commission received for purchase and sale of the livestock and for normal risk management fees. PLCC will receive a service fee (which includes the cost of money invested in the hogs) charged at a simple interest rate." Pl.'s App. 244, ECF No. 47–4.

The Proposal stated that "PLCC will retain ownership of all hogs in the program to avoid a debtor/creditor relationship with the farmer/feeder." Pl.'s App. 247, ECF No. 47–4. In order to protect PLCC from a feeder's unknown creditors, the Proposal also stated that "PLCC will file an informational Financing Statement (UCC–1) in the office of [the] Secretary of State. The statement serves as notice to all parties that the livestock is owned by PLCC." *Id.* The Hog Agreement stated that "[t]he parties agree hereto that the Livestock is and will remain, and at all times shall be deemed to be the sole and exclusive property of [PLCC], and [Prairie Pork Inc.] has no right of property therein." Pl.'s App. 252, ECF No. 47–4. However, the Hog Agreement also stated that "PLCC is the owner for security purposes only; and does not share in any of the losses or profits; and [is] entitled to recov-

of a remark in its reply brief to Lakeside's resistance to summary judgment that Producers "elected against a response to Lakeside's submission [of facts]," because the substance of Lakeside's own facts help to defeat Lakeside's claim and therefore "no reason [exists] for PLMA or PLCC to respond except to acknowledge its existence." Defs.' Reply Br. at 2, ECF No. 48. Producers argued at the hearing that it had not intended to admit Lakeside's statement of additional material facts. However, to the degree that Lakeside's statement of additional material facts is supported by the record, Producers has admitted those facts by its failure to file an appropriate

response. *See* LR 56.d ("The failure to reply, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact."); *see also Smith v. Insley's Inc.*, 499 F.3d 875, 879 (8th Cir.2007) ("District courts have broad discretion to set filing deadlines and enforce (or not enforce) local rules." (citing *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 579 (8th Cir.2006))).

2. Dr. Gayer jointly owns Prairie Pork with his wife, Kim Gayer. Dr. and Kim Gayer also individually executed the agreement with Producers.

er their cost from the hog proceeds," and that the Hog Agreement "shall in no way be construed as a commitment or guarantee by PLCC to pay expenses incurred by [Prairie Pork] in conjunction with this Agreement if a negative equity margin in hogs or other deficiency exists." *Id.*

At his deposition, Dr. Gayer clarified the structure of the lending agreement, commenting that he "felt that it was a Prairie Pork, Incorporated, operation and that the pigs were to be owned by Prairie Pork, Incorporated." Defs.' App. 136, ECF No. 44–3. Dr. Gayer remarked that the hogs were labeled as being owned by Prairie Pork and that "most of the documents that you see here has Prairie Pork on them, whether it's a feed bill, a bill for the pigs themselves, or information that came from either side." Defs.' App. 137, ECF No. 44–3. Dr. Gayer further explained that "I felt that basically we had signed away our marketing rights in order to achieve some financing," but that "in the end we felt like the pigs were ours as an ownership situation." *Id.*

Dr. Gayer testified that his understanding was that under the Hog Agreement, Prairie Pork was responsible for any losses and entitled to any profits. The Hog Agreement itself memorialized that Dr. Gayer and Prairie Pork ultimately remained liable for all costs associated with growing and readying the hogs for market:

> The farmer/feeder must supply feed, supplement, medication, veterinarian, market price risk management, consultant fees (if necessary), trucking, liability insurance, and any other miscellaneous costs incurred in the normal course of feeding livestock. The potential benefit to the feeder is the ability to profit

from the overall gain of the livestock. Unlike other feeding contracts, which are based on a per pound gain formula, the program provides that the feeder can receive all of the "net" profit from the sale. The farmer/feeder is responsible for the costs incurred, as detailed above, and in the feeding agreement with PLCC.

Pl.'s App. 248, ECF No. 47–4; *see also id.* ("The farmer/feeder is also at risk if the sale proceeds of fed livestock is insufficient to reimburse PLCC for all its cost (which includes the purchase cost of the livestock, fees, interest, legal and costs associated with the processing and collecting).").

Under the Hog Agreement, PLCC "reserve[d] the right to recommend the appropriate feeding program" for the hogs. Pl.'s App. 246, ECF No. 47–4. PLCC requested that Dr. Gayer secure a professional livestock manager to help with growing the hogs. Dr. Gayer selected Lakeside to fulfill that role. Jim Noethe (Noethe), president and manager of Lakeside, explained that Lakeside did not have a written contract with Dr. Gayer, but rather a "handshake agreement." [3] Defs.' App. 186, ECF No. 44–3. Noethe testified that Lakeside's duties under the agreement were to

> line up the buildings, the nurseries and the finishers for the pigs, . . ., we would order any vaccinations, medicines for the pigs, order the feed, schedule moving the pigs to the finishers from the nurseries, weekly checks of the pigs. And then when they're ready to sell, then we would mark the fat hogs and then I would sell the hogs and line up the

---

**3.** Noethe admitted that Lakeside did not have either a written or oral agreement with PLCC. Noethe testified that he believes that both Producers and Dr. Gayer are responsible for unpaid feed bills but stated that he sued only

Producers "[b]ecause Producers received all the money from all the sales and that's where I figured the money should come from." Defs.' App. 185, ECF No. 44–3.

trucks to send them to the packing plant."

*Id.*

Dr. Gayer agreed to pay "$1.50 a head in and $1.50 a head out," plus costs, in exchange for Lakeside's services. Defs.' App. 186, ECF No. 44–3. However, Dr. Gayer did not pay Lakeside directly. Rather, beginning in December 2007, PLCC advanced funds to Lakeside for the purchase, care, and feeding of hogs. At his deposition, Dr. Gayer explained that having PLCC run the administrative functions of the hog growing program, such as paying bills, was one of the benefits of doing business with PLCC. Dr. Gayer confirmed that it was his understanding that Prairie Pork was always responsible for repaying PLCC, with interest, for the funds that PLCC advanced to Lakeside. Dr. Gayer also testified that he understood that, pursuant to the terms of the Hog Agreement, PLCC would not advance more than 70% of the market price of the hogs, and that if the amount PLCC advanced was insufficient to cover the cost of feed, Prairie Pork was responsible for any excess funding.

PLCC advanced funds on Dr. Gayer's behalf for the purchase of hogs until May 2008. However, by May 2008, Dr. Gayer had failed to continue providing his share of funding and therefore violated the equity ratio mandated by the Hog Agreement. A May 2, 2008, letter from Keith Meiergerd (Meiergerd), who at the relevant time was a loan officer in training at PLCC, and Walter Ernesti (Ernesti), a senior vice president of PLCC, explained to Dr. Gayer that "[y]ou need to get money sent in to Producers so that we are able to continue to pay feed bills and get some of the contracts back into compliance with the 70% debt of the finished hog value." Pl.'s App. 167, ECF No. 47–3. Meiergerd and Ernesti explained to Dr. Gayer that "you need to find a way to generate more money and get it into Producers so that we are not sitting on outstanding feed bills again," and cautioned that "[m]any of the contracts are reaching their 70% debt limit and the $100,000 that you plan to send in will only help pay outstanding feed bills through the month of April, then Producers is in the same situation of having to have you send money in to keep paying feed bills." *Id.* Meiergerd and Ernesti also remarked that

> Jim [Noethe] asked when Producers would be getting money into him. [Meiergerd] told him that Producers could get some money in by Monday after some paper work was signed (vet bills). [Meiergerd] also told him that Producers could get more of the bills paid once [Dr. Gayer] got some money into Producers. [Noethe] was under the assumption that you [Dr. Gayer] had sent Producers money and that Producers could pay some of the feedbills. We are not sure how he came to that assumption, but the sooner you get money into Producers and we can pay the feedbills the better.

*Id.*

Noethe testified that when the agreement between Lakeside and Dr. Gayer was consummated, Noethe believed that Dr. Gayer was responsible for compensating Lakeside for its services. However, when Producers became involved, Noethe testified that he believed the relationship changed and that Producers also became responsible for the outstanding feed bills because "[t]hey received all the money [from hog sales] and said that as they received more money I would get my outstanding bills paid." Pl.'s App. 391, ECF No. 47–5. Noethe explained that "[a]s of May of 2009 [sic] I considered [Producers] an owner of the pigs because they received all the money for the pigs, received all the bills, all the monthly reports, and told me

that they were going to pay the bills. They're the only ones that paid the bills on that account, and I considered them an owner in May of 2009."[4] *Id.* at 396. However, Noethe said that Lakeside "sent bills both to Producers and [Dr.] Gayer." Defs.' App. 191, ECF No. 44–3. Further, while Lakeside sent feed supplier invoices to Dr. Gayer, Lakeside did not send feed supplier invoices to Producers. Lakeside considers its business records accurate, and those business records list Dr. Gayer as the only purchaser and owner of the hogs.

Meiergerd noted that on March 21, 2008, PLCC sent a facsimile to Noethe that explained PLCC could not advance additional funds for feed bills at that time because PLCC had reached its 70% lending limit and was waiting to receive additional funds from Dr. Gayer before PLCC could transfer payment to Lakeside. Some feed bills due to Lakeside went unpaid and rapidly accumulated. In a May 2008 fax from Producers to Lakeside, Producers listed all outstanding feed bills and stated to Lakeside, "This [is] a listing of outstanding feedbills that is [sic] owed to Lakeside Feeders. Some of these bills have not been approved by [Dr. Gayer] yet, and some we are at our our [sic] lending limits until we receive money from [Dr. Gayer]. Producers hopes to have all the outstanding feedbills paid very soon." Pl.'s App. 169, ECF No. 47–3.

Dr. Gayer testified that he explained to Noethe that the financing for the hogs originated with PLCC and that Noethe "should have understood that, that [PLCC was] the lender for the pigs." Defs.' App. 94, ECF No. 44–3. Dr. Gayer denied ever telling Noethe that PLCC would lend more than 70% of the pigs' final market value. Ernesti testified that he spoke with Noethe in December 2007, and that while discussing where to send payment for the feed bills, Ernesti recalled telling Noethe that PLCC would only advance up to 70% of the hogs' market value. Meiergerd recalled that on another occasion, in response to Noethe's question about when Lakeside's feed bills would be paid, Meiergerd informed Noethe,

> according to our program we can advance up to 70 percent of the market value of the hog and that was our lending limit and in order for that to—if we were at that or over that, in order for that to come back into compliance and in order for us to be able to advance more funds for the feed bills for Dr. Gayer, that either Dr. Gayer would have to send funds in or that sale proceeds would need to come in.

Defs.' App. 250, ECF No. 44–3. Meiergerd said that on more than one occasion he told Noethe that PLCC could pay more feed bills once Dr. Gayer sent more money or more hogs were sold. Noethe admitted that he never asked and Producers never told him whether Dr. Gayer was stable financially or a good credit risk.

PLCC continued to wire funds to Lakeside to pay for some feed bills during 2008. Noethe admitted that a "substantial" amount was paid to Lakeside. Defs.' App. 224, ECF No. 44–3. However, the total amount of past due feed bills continued to mount despite payments. In response to a May 5, 2008, facsimile from Producers to Lakeside that outlined the amount of feed bills outstanding and due to Lakeside, Noethe wrote, "Tracy, I need payment for the 611 hd. that went to Galvin nursery and the above bill. Your April Bill is $397844.47!!" Defs.' App. 505, ECF No. 44–4. In response to a similar letter sent

---

**4.** Noethe admitted that he never read the Hog Agreement executed by PLCC and Dr. Gayer. Defs.' App. 216.

by Producers on July 24, 2008, Noethe wrote, "Tracy, this is not good! Please remit!" Defs.' App. 522, ECF No. 44–4. Dr. Gayer said that Noethe called him once a week to talk about feed bills and that Noethe would ask "if I knew what was going on or when it was going to be paid." Defs.' App. 160, ECF No. 44–3.

Noethe said that he believes Producers is responsible for paying the outstanding feed bills because Producers told him "that when they got paid for the pigs, then I would get paid for the pigs." Pl.'s App. 380, ECF No. 47–5. Noethe further explained that "I guess I trusted them that they would [make payments], and that's why I kept sending them all the money with basically all the outstanding bills that I had there at the end of the feeding period." *Id.* at 391.

In an email dated August 25, 2008, sent from Ernesti to Dr. Gayer's banker, Ernesti noted that "[o]ur estimate of the number of pigs Producers has financed that will be sold is approximately 18,000 head. Producers should get paid in full however, there will be outstanding feed bills owed to Jim [Noethe]." Pl.'s App. 365, ECF No. 47–5. Noethe said that he was never made aware that the sale of the hogs would not produce enough money to fully compensate Lakeside. In total, Lakeside alleges that it is owed $922,841.25 in feed bills.[5]

On January 26, 2009, Producers notified Lakeside that on January 28, 2009, PLCC would be "terminating its lien on the hogs owned by Prairie Pork Inc. (Tracy Gayer, DVM)," because Dr. Gayer had satisfied his debt to PLCC. Defs.' App. 373, ECF No. 44–4. The letter also notified Lake-

side that Producers was no longer doing business with Dr. Gayer. *Id.* The letter instructed Lakeside to call Ernesti or Meiergerd with any questions. However, Noethe admitted that Lakeside did not contact PLCC after January 26, 2009.

Lakeside filed this lawsuit in the Southern District of Iowa on December 31, 2009, seeking to recover damages from Producers for fraudulent misrepresentation (Count I), negligent misrepresentation (Count II), and unjust enrichment (Count III). This Court has original jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a)(1). On October 15, 2010, Producers filed this motion for summary judgment.

## II. DISCUSSION[6]

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Then, "[i]n order to create an issue for trial the nonmoving party must produce sufficient evidence to support a verdict in his favor based on more than 'speculation, conjecture, or fantasy.'" *Doe v. Dep't of Vet. Affairs,* 519 F.3d 456, 460

---

5. There is no dispute that some amount of Lakeside's feed bills remain unpaid. However, in its complaint, Lakeside alleged that the total amount of feed bills outstanding was $923,248.02. Pl.'s Compl. ¶¶ 37, 46, 51, ECF No. 1.

6. Because this is a diversity action, the Court applies Iowa law to Lakeside's substantive claims of fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment. *See Cedar Rapids Television Co. v. MCC Iowa LLC,* 560 F.3d 734, 739 (8th Cir.2009).

(8th Cir.2008) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir.2003)). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## B. Fraudulent Misrepresentation

 Under Iowa law, to prevail on a fraudulent misrepresentation claim, a plaintiff must show that

(1) [the] defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in [justifiable] reliance on the truth of the representation ..., (7) the representation was a proximate cause of [the] plaintiff's damages, and (8) the amount of damages.

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 735 (Iowa 2009) (alterations in original) (quoting *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001)). At trial, "[t]hese elements must be established by 'a preponderance of clear, satisfactory, and convincing proof.'" *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (quoting *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004)). "[A]

statement of intent to perform a future act is actionable if, when the statement is made, the speaker had an existing intent not to perform." *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F.Supp.2d 821, 844 (N.D.Iowa 2004) (applying Iowa law).

### 1. False, Material Representations

The first three elements of the tort are "frequently treated as a single element and referred to as fraudulent misrepresentation." *Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987). Producers argues that neither PLCC nor PLMA made a false, material representation to Lakeside. Lakeside argues that Producers' representations to Lakeside include that (1) Producers had reached its "lending limits until we receive money from Tracy or sell more hogs," Pl.'s App. 401, ECF No. 47–5; (2) Producers stated that it was "expecting more money from Tracy this week, so we should be able to pay more feedbills," Pl.'s App. 403, ECF No. 47–5; (3) Producers "specifically listed the 'outstanding [Feedbills] for Lakeside' due to be paid under the Hog Program and forwarded the list to Lakeside," Pl.'s Br. 6, ECF No. 47 (quoting Pl.'s App. 404, ECF No. 47–5); (4) Meiergerd told Noethe that Producers "could get more of the bills paid once Tracy got some money into Producers," Pl.'s App. 167, ECF No. 47–3; and (5) Producers "hope[d] to have all the outstanding feedbills paid very soon," Pl.'s App. 169, ECF No. 47–3. Lakeside alleges that these representations were false because Lakeside was never paid in full, and that the representations were material because they induced Noethe to continue feeding hogs and convinced Noethe that Noethe did not need to file a lien on the hogs.[7]

---

7. Noethe further alleged in his deposition that "[Producers] received all the money for the pigs, received all the bills, all the monthly reports, and told me that they were going to pay the bills," Pl.'s App. 396, ECF No. 47–5;

"[Producers] received all the money and said that as they received more money I would get my outstanding bills paid," Pl.'s App. 391, ECF No. 47–5; and "I was more than willing to send them the money or have the money

"Materiality has been found where a fact influences a person to enter into a transaction, where it deceives him or induces him to act, or where the transaction would not have occurred without it." *Renander v. Aamodt*, 777 N.W.2d 128, at \*3 (Iowa Ct.App. Nov. 12, 2009) (unpublished table decision) (quoting *Smith v. Peterson*, 282 N.W.2d 761, 765 (Iowa Ct.App.1979)). Assuming *arguendo* that Producers' alleged statements were material representations, Lakeside has failed to produce any evidence that the representations were false when made. Lakeside argues that evidence exists to support the falsity element because "Producers failed to pay Lakeside nearly $1 million in feed and management bills under the Hog Program." Pl.'s Br. 12, ECF No. 47. However, the consideration is not whether a representation is eventually found to be faulty, but rather whether a representation was false at the time that it was made. *See Spreitzer*, 779 N.W.2d at 735 ("Under the law, a representation must be false at the time it was made to support a claim of fraud, and a representation that was true cannot serve as a basis for a claim of fraud." (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir.2003) (applying Iowa law)).

Lakeside has not pointed to anything in the record that shows Producers' representations to Lakeside were false at the time that those representations were made. Producers' statements were largely recitations of fact including a listing of the total amount of outstanding feed bills owed to Lakeside and the fact that Producers was at its lending limit and was unable to advance more funds to Lakeside until either Dr. Gayer increased his equity stake or more of the hogs were sold. Lakeside produced no evidence that PLCC was not, in fact, at its lending limit or that Producers' record of outstanding bills owed by Dr. Gayer to Lakeside was inaccurate.

Lakeside notes that Producers represented in a facsimile dated August 5, 2008, that it was "expecting more money from Tracy this week, so we should be able to pay more feedbills." Pl.'s App. 403, ECF No. 47–5. However, again Lakeside provided no evidence that such a statement was false when made. In fact, the record reflects that Producers did just as it represented—Producers continued to wire substantial payments to Lakeside throughout August 2008.

It is undisputed that both contemporaneous with and subsequent to making the representations to Lakeside, Producers continually warned Dr. Gayer that Producers could not advance additional funds to compensate Lakeside until either more hogs were sold or Dr. Gayer made additional equity infusions. Producers' statement to Lakeside that it "hope[d] to have all the outstanding feedbills paid very soon," Pl.'s App. 169, ECF No. 47–3, was neither a promise nor a guarantee, but rather a statement premised upon Dr. Gayer providing additional funds to Producers. *See id.* ("Some of these bills have not been approved by Tracy yet, some we are at out lending limits until we receive money from Tracy."). There is no evidence that, at the time Producers made representations to Lakeside, Producers was aware that Dr. Gayer would be unable to provide enough equity to come back into compliance with the mandated equity ratio or that the eventual sale of the hogs would fail to generate enough revenue to fully satisfy Dr. Gayer's and Prairie Pork's debts to all parties. *But cf. Spreitzer*, 779 N.W.2d at 736 (concluding that a reasonable jury could find that a representation was false when made where evidence exist-

sent to them because I was told that when they got paid for the pigs, then I would get paid for the pigs," Pl.'s App. 380, ECF No. 47–5.

ed showing that the defendant was aware that its representation would be unlikely to be fulfilled and that the defendant did not comply with its promise).

■ Under Iowa law, a plaintiff must prove *each* of the elements of fraudulent misrepresentation "by a preponderance of clear, satisfactory, and convincing proof." *Van Sickle Constr. Co.*, 783 N.W.2d at 687 (internal quotation marks and citation omitted). Because Lakeside cannot show that any of the above cited representations were false when made, the second element (false) and the fourth element (knowledge) are lacking, and its claim of fraudulent misrepresentation must fail. *See Hannoon*, 324 F.3d at 1048 ("Because Hannoon alleged no false statement, his claim of fraudulent representation under Iowa law fails."); *see also Doe*, 519 F.3d at 460 ("In order to create an issue for trial the non-moving party must produce sufficient evidence to support a verdict in his favor based on more than 'speculation, conjecture, or fantasy.'" (quoting *Putman*, 348 F.3d at 733–34)).

## 2. Justifiable Reliance on the Representations

■ Although Lakeside's fraudulent misrepresentation claim cannot be maintained because Lakeside cannot prove that any of Producers' representations were false when made, the Court also finds that Lakeside cannot prove that it justifiably relied upon Producers' representations in deciding to continue extending credit to Dr. Gayer.

■ "Like most jurisdictions, [Iowa] require[s] reliance on the representation to be justified, not reasonable." *Spreitzer*, 779 N.W.2d at 736. "[T]he justified standard followed in Iowa means the reliance does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and

the specific surrounding circumstances." *Id.* at 737. "This standard reflects that fraudulent misrepresentation is an intentional tort, and like other intentional torts, recovery is not necessarily barred by the fault of the plaintiff that contributed to the damage." *Id.*

■ The Iowa Supreme Court has determined that because Iowa's common-law fraud cause of action parallels the federal fraud cause of action, the federal fraud claim factors are helpful in determining whether justifiable reliance existed. *Id.* The factors are

(1) the sophistication and expertise of the plaintiff in financial ... matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the ... transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.* (quoting *Davidson v. Wilson*, 973 F.2d 1391, 1400 (8th Cir.1992) (alterations in original) (applying factors in Rule 10b–5 claim)). The fraud factors must be considered together and balanced because no single factor is dispositive. *Davidson*, 973 F.2d at 1400. "Normally, the decision whether or not reliance by a plaintiff is justified is one for the fact finder to resolve." *Spreitzer*, 779 N.W.2d at 739. However, Iowa Courts have approved the disposal of a fraudulent misrepresentation claim on the basis that the plaintiff did not justifiably rely on the representation. *See Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005) (upholding the district court's ruling that, as a matter of law, the plaintiff could not prove "reasonable reliance").

Producers argues that Lakeside did not justifiably rely on any alleged misrepre-

sentation made by Producers because PLCC was a secured lender with lending limits of which Lakeside was aware, and therefore it would not have been justified for Lakeside to expect Producers to advance funds to Lakeside beyond Producers' lending limit. Lakeside argues that its reliance was "reasonable considering the well-established course of conduct between Producers and Lakeside." Pl.'s Br. 14, ECF No. 47. Lakeside notes that Producers had regularly paid the feed bills in the past and that Producers never instructed Lakeside to seek payment from Dr. Gayer during the course of Producers' dealings with Lakeside.

Lakeside cannot "blindly rely on a representation." *Spreitzer*, 779 N.W.2d at 737. "Instead, the standard requires [Lakeside] to utilize [its] abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element has been met." *Id.* (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir.2003)). The record reflects that while Producers routinely paid Lakeside directly for feed bills and for the purchase of hogs, Producers also repeatedly informed Noethe that Dr. Gayer had reached his lending limit and that Producers would not advance more funds to Lakeside until either hogs were sold or Dr. Gayer made an additional equity infusion. In addition, it is undisputed that Lakeside negotiated its agreement with Dr. Gayer, not Producers, and did not execute a written or oral agreement with Producers. Dr. Gayer said that he explained to Lakeside that Producers was merely financing the hogs, that Producers was not an owner of the hogs, and that Producers could not advance to Lakeside more than 70% of the market value of the hogs. Producers' facsimiles to Lakeside repeatedly represented that the money wired to Lakeside to pay for feed bills was for the "Tracy Gayer Account," and that outstanding debt was on "PLCC *Financed* Hogs," and in no way represented that the hogs belonged to Producers. Defs.' App. 398–99, ECF No. 44-4 (emphasis added).

Further, Lakeside's own conduct demonstrates that it did not rely upon Producers' representations. Lakeside sent supplier feed invoices to Dr. Gayer but not to Producers. Lakeside's business records listed only Dr. Gayer as the purchaser and owner of the hogs. When Noethe attempted to collect outstanding feed bills in 2008, he did so by pleading with Dr. Gayer, stating, "Tracy, I need payment for the 611 hd. that went to Galvin nursery and the above bill. Your April Bill is $397844.47!!," Defs.' App. 505, ECF No. 44-4, and "Tracy, this is not good! Please remit!," Defs.' App. 522, ECF No. 44-4. Following Producers' January 26, 2009, letter informing Lakeside that Producers had been fully paid by Dr. Gayer and that Producers was releasing its lien on the hogs that Dr. Gayer owned, Lakeside did not attempt to contact Producers to seek clarification as to who owned the hogs or to attempt to collect the feed debt in excess of $900,000. Conversely, Noethe continued to talk with Dr. Gayer regarding outstanding feed bills.

An application of the federal fraud factors set out in *Davidson* similarly demonstrates that if Lakeside detrimentally relied upon any representations made by Producers, such reliance was not justifiable. *See Davidson*, 973 F.2d at 1400. Lakeside is a "bonded order buying company" that "manage[s] hogs for investors." Defs.' App. 178, ECF No. 44-3. Lakeside is a financially sophisticated company that has served clients in the agricultural industry for many years, averaging nearly five years longevity with each of its clients. *See* Pl.'s App. 417, ECF No. 47-5 ("Jim Noethe of Lakeside advised Lakeside had many long term customers.... For example, Lakeside has 60 percent or

more of such customers that have remained with Lakeside for more than five years, including 20 percent that have remained as customers for more than ten years. Employing a weighted average of customer longevity results in an average of 4.95 years."). Dr. Gayer, not Producers, approached Lakeside and contracted with Lakeside to provide for the care and feeding of Dr. Gayer's hogs. Lakeside knew Dr. Gayer was responsible for payment for Lakeside's services as demonstrated by Lakeside's direct and consistent contact with Dr. Gayer. Because Lakeside dealt directly with Dr. Gayer, there is no evidence Producers ever attempted to conceal from Lakeside the actual responsible party. The representations made by Producers regarding payment were general in nature and merely stated facts known by Lakeside, that is, Producers was at its lending limit and would not advance more funds on behalf of Dr. Gayer unless Dr. Gayer contributed more equity or additional hogs were sold.

Ultimately all involved were subject to market factors at the time the collateral was sold. That raises issues of non-disclosure, which are addressed *infra*.

In light of the facts outlined above, and in consideration of the entire context of the transaction, the Court finds, as a matter of law, that Lakeside has not presented evidence demonstrating that it justifiably relied upon the representations made by Producers in deciding to continue to provide feed and other services to Dr. Gayer. *See Spreitzer*, 779 N.W.2d at 737.

### 3. Fraudulent Non-disclosure

Lakeside also argues that, even if at the time Producers made representations to Lakeside Producers was unaware that the hogs would not generate enough revenue to satisfy Lakeside's claims, Producers fraudulently concealed information by failing in its alleged duty to inform Lakeside that the hogs would not generate enough revenue to satisfy all parties with a monetary interest therein.

In Iowa, "[a] representation need not be an affirmative misstatement; the concealment of or failure to disclose a material fact can constitute fraud." *Clark v. McDaniel*, 546 N.W.2d 590, 592 (Iowa 1996) (citations omitted). "However, for concealment to be actionable, the representation must 'relate to a material matter known to the party . . . which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances.'" *Id.* (quoting *Sinnard*, 414 N.W.2d at 105). "There is no specific test for determining when a duty to reveal arises in fraud cases." *Id.*

Lakeside points out that in an August 25, 2008, email from Ernesti to Dr. Gayer's banker, Ernesti noted that "[o]ur estimate of the number of pigs Producers has financed that will be sold is approximately 18,000 head. Producers should get paid in full however, there will be outstanding feed bills owed to Jim [Noethe]." Pl.'s App. 365, ECF No. 47–5. Lakeside speculates that in May or June of 2008, Producers became aware that the hogs would not generate enough revenue in order to allow Dr. Gayer to satisfy all debts, but did not notify Lakeside of the anticipated shortfall. However, Lakeside provided no evidence to support this speculative assertion.

More importantly, regardless of Producers' internal estimates of hog yields, Producers was under no legal duty to communicate its internal estimates to Lakeside. A legal duty to disclose information may be created in a number of ways. Such a duty may be created "in situations where the plaintiff and the defendant were involved in some type of

business transaction, such as buyer/seller or owner/contractor." *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002) (citations omitted). However, no duty is created under the present scenario because Lakeside and Producers were not involved in a business transaction together.[8] Rather, Producers' relationship with Lakeside was incidental to Lakeside's business relationship with Prairie Pork.

Further, no duty was created due to an inequity of condition and knowledge between Producers and Lakeside. As the entity that provided care for the hogs, kept detailed records as to expenses incurred on behalf of the hogs, and, most often, arranged for the sale of hogs at market, Lakeside had at least equal, if not superior, knowledge to Producers with regard to the possible gross market value of the hogs. Further, Lakeside is far from an inexperienced entity that relied on Producers for information. As discussed *supra*, Lakeside is a financially sophisticated company that has served clients for many years. Lakeside was not an inexperienced entity that was forced to rely on Producers

for guidance in conducting its business operations. To the contrary, Lakeside's intimate dealing with the hogs at issue and experience in the field of growing hogs for market provided Lakeside with a broad base of knowledge that precludes a legal duty that might arise between Lakeside and the lender to the party with which Lakeside orally contracted.

Finally, although a duty to disclose exists when a party acquires information "that he knows will make untrue or misleading a previous representation that when made was true or believed to be so," *Wright*, 652 N.W.2d at 175 (quoting Restatement (Second) of Torts § 551(2)(c)), Producers never represented that Producers would advance 100% of the outstanding feed bills. In any event, as previously discussed, Lakeside did not justifiably rely on Producers' representations, and therefore no duty was created. *See id.* ("A party must use reasonable care to disclose such subsequently acquired information to another party who has relied on the prior representation." (citations omitted)). Because Producers did not owe a legal duty

---

**8.** In response to Producers' statement of undisputed facts, Lakeside asserts that in documents executed between Producers and Dr. Gayer/Prairie Pork in connection with the Hog Agreement, Producers represented itself as an owner of the hogs and that Producers was not a typical lender nor Dr. Gayer a typical borrower in the ordinary sense of a lending relationship. However, the issue before the Court in connection with Lakeside's claims against Producers is whether Producers owed a legal duty to Lakeside, which is a question of law to be resolved by the Court. *See Overturff v. Raddatz Funeral Servs., Inc.*, 757 N.W.2d 241, 245 (Iowa 2008) ("Because the existence of a duty under a given set of facts is a question of law for the court, it is properly resolvable by summary judgment."). Lakeside points to its own expert's opinion that "Producers['] and Lakeside['s] financial data and information as well as Producers' written representations and actions toward Lakeside and Gayer were consistent with that of an owner of the hogs." Pl.'s Br. 412, ECF

No. 47–5. However, Lakeside's expert's opinion was based upon the documents and evidence submitted to the expert by Lakeside regarding the relationship between Producers and Dr. Gayer. Those same documents and evidence, which constitute only a portion of the entire record, have been submitted to this Court to make the same determination, and therefore the expert's opinions were "more or less legal conclusions about the facts of the case as presented to the expert[] by the [plaintiff]. As a result, the expert opinion[] w[as] merely an opinion[] meant to substitute the judgment of the district court." *In re Acceptance Ins. Cos. Securities Litig.*, 423 F.3d 899, 905 (8th Cir.2005) ("When expert opinions are little more than legal conclusions, a district court should not be held to have abused its discretion by excluding such statements when ruling on a summary judgment motion."). Accordingly, the Court finds Producers was in the position of a lender for purposes of the current analysis of the interaction with Lakeside.

to Lakeside, Lakeside's fraudulent misrepresentation claim predicated on non-disclosure must also fail as a matter of law.

## C. Negligent Misrepresentation

 "[N]egligent misrepresentation has always been understood as an economic tort allowing for the recovery of purely economic losses." *Van Sickle*, 783 N.W.2d at 692. Negligent misrepresentation takes places when

> [o]ne who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Sturm v. Peoples Trust & Savings Bank*, 713 N.W.2d 1, 5 (Iowa 2006) (quoting Restatement (Second) of Torts § 552).

> As with all negligence actions, an essential element of negligent misrepresentation is that the defendant must owe a duty of care to the plaintiff. In the context of negligent misrepresentation, this means the person who supplies the information must owe a duty to the person to whom the information is provided. Although the Restatement supports a broader view, we have determined that this duty arises only when the information is provided by persons in the business or profession of supplying information to others.

*Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 124 (Iowa 2001) (citations omitted).

> Thus, when deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, we distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial. We recognize the former circumstances justify the imposition of a duty of care because a transaction between a person in the business or profession of supplying information and a person seeking information is compatible to a special relationship.

*Id.* (internal citations omitted). "Moreover, a person in the profession of supplying information for the guidance of others acts in an advisory capacity and is manifestly aware of the use that the information will be put, and intends to supply it for that purpose." *Id.* at 124–25. "[T]he supplied 'for the guidance of others in their business transactions' requirement recognizes that the tort predominantly applies to situations where the information supplied harmed the plaintiff in its relations with third parties, as opposed to harm to a plaintiff in its relations with the provider of the information." *Id.* at 126 (quoting *State by Bronster v. U.S. Steel Corp.*, 82 Hawai'i 32, 919 P.2d 294, 303 (1996)).

Producers argues that neither PLMA nor PLCC are in the business of supplying information because PLMA is largely a marketing company and because PLCC is a lender. Producers argues that it did not undertake a duty to advise or to supply guidance to Lakeside. Lakeside argues that "Producers intended to supply representations for Lakeside's benefit and guidance because Producers, in an attempt to improve its own pecuniary interest, wanted Lakeside to continue feeding and managing Producers['] Pigs." Pl.'s Br. 17, ECF No. 47. Lakeside also contends that Producers owed Lakeside a duty because, "due to the parties' course of dealing, a 'special relationship' existed such that Producers knew Lakeside was relying on its representations when incurring additional feed costs for Producers' benefit." *Id.*

*Sain v. Cedar Rapids Community School District,* wherein the Iowa Supreme Court considered whether a high school guidance counselor was in the business or profession of supplying information to others, is instructive in the present case. In *Sain,* the court noted that "a person in the profession of supplying information for the guidance of others acts in an advisory capacity and is manifestly aware of the use that the information will be put, and intends to supply it for that purpose." [9] *Sain,* 626 N.W.2d at 124–25 (citations omitted). "Such a person," the court continued, "is also in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect." *Id.*

Concluding that a high school guidance counselor is in the business of supplying information to others, the court reasoned counselors and students have relationships that extend beyond arm's length transactions, and are advisory in nature rather than adversarial. *Id.* at 126. The court further reasoned that a counselor "does not act for his or her own benefit, but provides information for the benefit of students." *Id.* Further, because the information the counselor provided to the student related to attending college, the counselor "clearly assumes an advisory role, is aware of the use for the information, and knows the student is relying upon the information provided." *Id.* Finally, the court noted that the counselor was paid by the school to provide advice to students and that "the information is not incidental to some more

central function or service provided by the counselor." *Id.* The court concluded that it continued "to confine the tort of negligent misrepresentation to persons in the business or profession of supplying information to others, but find[s] that a high school counselor falls within that language because the policies which support the imposition of a duty of care on such a person applies to a high school counselor." *Id.* at 128.

■ The facts of this case, and Producers relationship with Lakeside, are distinguishable from the facts of *Sain.* Unlike the relationship between a counselor and a student, the relationship between Producers and Lakeside was not advisory in nature. Producers advanced funds to Lakeside on behalf of Dr. Gayer and did not advise Lakeside on business matters. Noethe admitted that he did not ask Producers about Dr. Gayer's creditworthiness and that Producers did not provide Lakeside with any information about Dr. Gayer's creditworthiness. The information Producers provided to Lakeside consisted of a running tally of outstanding feed bills owed by Dr. Gayer, notice that Producers could not advance more funds to Lakeside until either Dr. Gayer advanced more funds or hogs were sold, and an expression of optimism that Producers hoped the bills would be paid soon. Unlike the counselor in *Sain,* Producers did not clearly assume an advisory role, and there is no evidence that Producers knew Lakeside relied on the very little information that Producers provided in deciding to continue providing feed to Dr. Gayer's hogs. Further, unlike

---

9. The *Sain* court commented that the language in section 552 of the Restatement "does not expressly provide that the tort applies only to persons who are in the business or profession of supplying information." *Sain,* 626 N.W.2d at 124 n. 3. Rather, under the Restatement, "[t]he information can be supplied by a person whose business it is to provide information, *or* the person otherwise

has a pecuniary interest in the transaction in which the person supplies the information." *Id.* (emphasis added). However, the court expressly excluded alternate methods of imposing a duty of care and reiterated that "we have limited the tort to persons in the business or profession of supplying information to others." *Id.*

the counselor in Sain, Producers is not paid to provide advice to Lakeside; and the information was, at best, incidental to Producers' main function, providing lending services to Dr. Gayer.

The Court finds that under the facts of this case, Producers was not in the business or profession of supplying information to Lakeside.[10] *Compare Larsen v. United Fed. Sav. & Loan Ass'n,* 300 N.W.2d 281, 287 (Iowa 1981) (concluding that a savings and loan company was in the business of supplying information where it provided an appraisal to a home buyer), and *Ryan v. Kanne,* 170 N.W.2d 395, 402 (Iowa 1969) (concluding that accountants, attorneys, and abstractors are in the business or profession of supplying information to others), and *McCracken v. Edward D. Jones & Co.,* 445 N.W.2d 375, 382 (Iowa Ct.App. 1989) (concluding that an investment broker was in the profession of supplying information to investors), *with Freeman v. Ernst & Young,* 516 N.W.2d 835, 838 (Iowa 1994) (concluding that no duty was owed where a seller "made representations while negotiating for the sale of his video rental business, a commercial transaction in which the parties were dealing at arm's length"), and *Meier v. Alfa-Laval, Inc.,* 454 N.W.2d 576, 581–82 (Iowa 1990) (concluding that a dealer that later serviced and repaired the equipment it sold was not in business or profession of supplying information to others), and *Greatbatch v. Metro. Fed. Bank,* 534 N.W.2d 115, 118 (Iowa Ct.App.1995) (noting that "whether a bank can be responsible for negligent misinformation depends largely on the na-

ture of the particular transaction involved and the type of information provided" and concluding that "information concerning the inspection certificate [provided by the bank to the customer] was not an additional product supplied by the bank, ..., but was incidental to the underlying financial transaction"). Because Lakeside has provided no evidence to show that Producers was in the business or profession of supplying information to Lakeside, the Court finds that Producers did not owe a duty to Lakeside, and therefore Lakeside's negligent misrepresentation claim must fail as a matter of law.[11] *See Hendricks v. Great Plains Supply Co.,* 609 N.W.2d 486, 492 (Iowa 2000) ("Without facts to show a person is in the business of supplying information to others, no duty arises." (citing *Fry v. Mount,* 554 N.W.2d 263, 266 (Iowa 1996)).

### D. Unjust Enrichment

 "Unjust enrichment is an equitable principle mandating that one shall not be permitted to unjustly enrich oneself at the expense of another or to receive property or benefits without making compensation for them." *Brown v. Kerkhoff,* 504 F.Supp.2d 464, 543 (S.D.Iowa 2007) (applying Iowa law) (quoting *W. Branch State Bank v. Gates,* 477 N.W.2d 848, 851–52 (Iowa 1991)). Unjust enrichment "is premised on the idea that it is unfair to allow a person to benefit from another's services when the other expected compensation." *State Pub. Defender v. Iowa Dist. Court for Woodbury Cnty.,* 731 N.W.2d 680, 684 (Iowa 2007). "Iowa courts discuss

---

**10.** Producers also argues that it owed no duty to Lakeside because "[a]s Dr. Gayer's agent, Lakeside cannot accede to greater right than its principal would have." Defs.' Br. 10, ECF No. 44–1 (citing *Peppmeier v. Murphy,* 708 N.W.2d 57 (Iowa 2005)). However, because the Court finds that Producers was not in the business or profession of supplying informa-

tion to Lakeside, the Court need not address Producers' alternative argument.

**11.** Further, as previously discussed, Lakeside cannot establish the false representation nor justifiable reliance elements of the tort of negligent misrepresentation, and therefore Lakeside's claim must fail for these reasons as well. *See supra* Sections II.B.1–2.

three elements in analyzing a claim for unjust enrichment: (1) whether the recipient was enriched by the receipt of the benefit; (2) if the enrichment was at the expense of the provider; and (3) whether it is unjust to allow the recipient to retain the benefit under the circumstances." [12] *Waldner v. Carr*, 618 F.3d 838, 848 (8th Cir.2010) (citing *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001)). Unjust enrichment "may arise from contracts, torts, or other predicate wrongs, or it may also serve as independent grounds for restitution in the absence of mistake, wrongdoing, or breach of contract." *Unisys Corp.*, 637 N.W.2d at 154.

Producers does not dispute that it received a benefit in part because Lakeside provided feed and other services for Dr. Gayer's hogs, but argues that it did not receive a benefit at the expense of Lakeside because "the uncontroverted facts establish PLCC received the proceeds of sale of its collateral, which was appropriate." Defs.' Br. 12, ECF No. 44–1. Producers also argues that Lakeside willingly put itself in the position of being second in priority to Producers by continuing to supply feed and services to Dr. Gayer on an unsecured basis. *Id.*

Lakeside, citing no authority, argues that "Producers' enrichment was at Lakeside's expense because Producers used money sold for hogs [sic] or available to PLCC from Gayer to pay itself, not Lakeside, resulting in nearly one million dollars in losses to Lakeside." Pl.'s Br. 20, ECF No. 47. However, while Producers received a benefit from the receipt of funds that, in the absence of Dr. Gayer's debt to Producers, may have otherwise gone to pay Lakeside's feed bills, there is no evidence that Producers was enriched at the *expense* of Lakeside. Rather, the record reveals that although the Hog Agreement identified PLCC as an "owner" of the hogs, PLCC's status as an "owner" was "for security purposes only; and [PLCC] does not share in any of the losses or profits; and [PLCC] is entitled to recover their cost from the hog proceeds." Pl.'s App. 250, ECF No. 47–4. The Proposal also provided that PLCC would file an informational financing statement in order to "protect the financial interest of PLCC against creditors that PLCC is not aware of, or additional creditors that become a part of [Dr. Gayer]'s borrowings after the livestock arrive on the farm." Pl.'s App. 118, ECF No. 47–3. Dr. Gayer acknowledged that he understood PLCC to be only a lender, and that he and his wife owned the hogs that were financed by the Hog Agreement.[13] *See* Defs.' App. 136,

12. Some courts continue to incorporate a fourth element, whether an adequate legal remedy exists to address the claim, in determining whether an individual or entity has been unjustly enriched. *See, e.g. Union Pac. R.R. Co. v. Cedar Rapids and Iowa City R.R. Co.*, 477 F.Supp.2d 980, 1000 (N.D.Iowa 2007) (" 'Unjust enrichment' requires the claimant to prove the following: (1) that the claimant conferred a benefit upon the other party to its own detriment; (2) the other party had an appreciation of receiving the benefit; (3) the other party accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value; and (4) there is no at-law remedy that can appropriately address the claim." (citing

*Iowa Waste Sys., Inc. v. Buchanan Cnty.*, 617 N.W.2d 23, 30 (Iowa Ct.App.2000))); *W. Reserve Life Assur. Co. of Ohio v. Bratton*, 464 F.Supp.2d 814, 844 (N.D.Iowa 2006) (citing same factors). However, as the court explained in *Unisys*, "[t]he adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity, but no independent principle exists that restricts restitution to cases where alternative remedies are inadequate." *Unisys*, 637 N.W.2d at 155 n. 2 (citation omitted).

13. Although Noethe testified at his deposition that he believed Producers owned the hogs

ECF No. 44–3 (Dr. Gayer noted that "we felt that it was a Prairie Pork, Incorporated, operation and that the pigs were to be owned by Prairie Pork, Incorporated."). Dr. Gayer admitted that Prairie Pork was responsible for repaying all of the money that Producers had advanced, with interest. Defs.' App. 162. Likewise, Lakeside's own business records refer only to Gayer as the purchaser and owner of the hogs. The Court concludes, as a matter of law, because Producers was first in priority with regard to the sale of hogs covered by the Hog Agreement, and was thus entitled to recover prior to other creditors, that Producers was not enriched at the expense of Lakeside. *See Iconco v. Jensen Constr. Co.*, 622 F.2d 1291, 1302 (8th Cir.1980) (applying Iowa law) ("[I]f the defendant has a claim to the benefit superior to that of plaintiff, surely it would not be unjust for the defendant to retain the benefit.").

As to the third element, Lakeside argues that it is unjust to allow Producers to retain profits from the sale of Gayer hogs because Producers made false representations to Lakeside, and as a result, "Lakeside paid the underlying feed costs which enabled Produce[rs] to realize the hog sale proceeds." Pl.'s Br. 20. As discussed above, Lakeside cannot prove that representations made by Producers were false when made or that Lakeside justifiably relied on Producers' representations. Further, the Hog Agreement stated that

[t]his Agreement shall in no way be construed as a commitment or guarantee by PLCC to pay expenses incurred by [Prairie Pork] in conjunction with this Agreement if a negative equity margin in hogs or other deficiency exists. Additionally, PLCC is not bound to return compensation at the time livestock

is sold if a deficiency exists on any other Agreement currently in existence with [Prairie Pork].

Pl.'s App. 252, ECF No. 47–4. Producers had a superior legal right relative to Lakeside to collect from the sale of the hogs that Producers financed. Because Lakeside cannot prove that it would be unjust for Producers to retain the benefit, Lakeside's unjust enrichment claim must be dismissed as a matter of law. *See Iconco,* 622 F.2d at 1302.

## III. CONCLUSION

Producers' Motion for Summary Judgment (ECF No. 44) must be **granted.** The case is **dismissed,** and the Clerk of Court is directed to enter judgment for the Defendants and against the Plaintiff.

**IT IS SO ORDERED.**

together with Gayer, his alleged belief is immaterial in determining which entity had first

priority over the proceeds of the hog sales.